### STATE OF CONNECTICUT *v.* RICHARD DORANS
### (SC 16697)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued April 23—officially released October 15, 2002

*Stephen E. Reck*, special public defender, for the appellant (defendant).

*Paul E. Murray*, state's attorney, with whom, on the brief, was *Kevin T. Kane*, state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Richard Dorans, appeals[1] from the judgment of conviction,[2] following a jury trial, of manslaughter in the second degree[3] in violation of General Statutes § 53a-56 (a) (1).[4] The defendant claims that the trial court improperly: (1) instructed the jury on the element of causation; (2) instructed the jury on the use of deadly physical force in connection with the defendant's claim of self-defense; (3) denied the defendant's motion for judgment of acquittal on the basis of evidentiary insufficiency; (4) failed to conduct an adequate investigation into alleged juror misconduct;

---

[1] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The trial court sentenced the defendant to a term of seven years imprisonment, execution suspended after thirty months, and four years probation.

[3] The defendant was charged with manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3). The jury, however, found the defendant guilty of the lesser included offense of manslaughter in the second degree.

[4] General Statutes § 53a-56 (a) provides in relevant part: "A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

(5) precluded the defendant from impeaching one of the state's witnesses with evidence of prior criminal convictions; and (6) permitted the state to introduce into evidence a photograph of the victim and his wife. We reject each of these claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On November 30, 1998, the victim, John Cahoon, and the defendant both were employed as electricians by the Electric Boat Division of General Dynamics in Groton (Electric Boat). On that day, both the defendant and the victim worked the second shift, which began at 3:30 p.m. and ended at 1:30 a.m., with a twenty minute meal break at 8 p.m. At this time, the defendant was forty-one years old, six feet three inches tall and 240 pounds.[5] The victim was sixty-three years old, five feet eight inches tall and approximately 190 pounds.

At approximately 8 p.m., the defendant and the victim, along with a number of other second shift employees, took their break in a locker room (room) designated for such breaks. The room had a concrete floor, several rows of steel lockers, two tables and several chairs. During the break, certain employees initiated a conversation concerning layoffs.[6] The conversation revolved around a discussion about a former supervisor who, after having been laid off, was rehired as an hourly worker, but at a higher rate of pay than other hourly workers. The defendant, a union steward at that time, indicated that he would investigate the former supervisor's rehiring and rate of pay. The victim left the room before the end of the break period, but returned shortly thereafter, apparently because he was interested in the conversation.

---

[5] The defendant also was described by witnesses as being very strong and muscular.

[6] There had been a number of layoffs at Electric Boat, including several electricians, in the recent past.

During the conversation, the defendant was seated at a table with several coworkers while the victim leaned against a nearby locker. The conversation intensified shortly after the victim's return. In particular, the victim accused the defendant of "hiding behind the button," a reference to the "super seniority" status that the defendant enjoyed as a union steward.[7] In response, the defendant, in a raised voice, told the victim, "[s]hut your mouth before I shut it for you," and then stated, "[y]ou don't think I'll hit you, huh?" The two men were approximately ten feet apart at this time. At that point, the victim put on his hard hat and prescription safety glasses[8] and started to leave the room.

In order to exit the room, however, the victim was required to walk by the table at which the defendant was seated. As the victim attempted to exit the room, the defendant sprung to his feet and struck the victim twice in the head. The first blow was delivered with such force that it knocked the victim's hard hat and safety glasses off his head and caused the victim to fall to one knee. The second powerful blow,[9] delivered immediately after the first, knocked the victim face down onto the concrete floor. The victim, who was bleeding from the nose and mouth, remained on the floor for several minutes.

Believing that the defendant was preparing to strike the victim again, the shift supervisor, Ronald Poole, ran to separate the defendant from the victim and directed the defendant to sit down, which he did. Another employee telephoned for an ambulance. Two other

---

[7] The defendant's "super seniority" status enabled him to retain his job at Electric Boat even when more senior employees were being laid off.

[8] Under applicable safety regulations, hard hats and safety glasses are required to be worn in shipyard work areas.

[9] One witness described the second blow as making a sound like "hitting a watermelon with a baseball bat." Another witness characterized the blow as a "power slam."

coworkers retrieved some paper towels to clean the blood from the victim's face. Emergency medical personnel soon arrived and, after assisting the victim into the ambulance, transported him to the emergency room of the Lawrence and Memorial Hospital in New London.

Upon arrival at the hospital, the victim initially was evaluated by emergency room personnel, who decided to discharge the victim after assessing his condition. The victim's condition soon deteriorated, however, and he lost consciousness before being discharged. He then was treated by Joel Abramovitz, a neurosurgeon. A CT[10] scan revealed that the victim was suffering from life threatening intracranial pressure caused by a intracerebral hemorrhage and forming hematoma. Abramovitz performed emergency surgery to relieve the pressure, but the victim nevertheless died on December 4, 1998.

At trial, Abramovitz testified about the nature and extent of the victim's injuries. On direct examination, Abramovitz concluded with reasonable medical certainty that blunt force trauma to the victim's head was the cause of the intracerebral hemorrhage and hematoma, which, in turn, caused the victim to experience intracranial pressure. On cross-examination, Abramovitz acknowledged that an examination of the victim's brain that was performed in connection with the victim's autopsy revealed that the victim had suffered from amyloid angiopathy[11]—a condition that ultimately can

[10] "CT" is an acronym for computed tomography, which is a method by which a three dimensional image of the internal organs or tissue of a person's body is produced through computer analysis of a series of cross sectional scans made along a single axis of the subject. See generally 2 Gale Encyclopedia of Medicine (D. Olendorf et al. eds. 1999) pp. 774–76.

[11] Cerebral amyloid angiopathy is a condition through which degeneration of certain cerebral arteries occurs by virtue of the formation of amyloid—a waxy, starch like substance consisting of proteins—in the walls of the cerebral arteries. 2 T. Harrison, Principles of Internal Medicine (14th Ed. 1998) p. 2344. The arteriolar degeneration associated with cerebral amyloid angiopathy can result in spontaneous intracerebral hemorrhages. Id.

lead to spontaneous intracerebral bleeds—even before the incident involving the defendant. On redirect examination, however, Abramovitz concluded that amyloid angiopathy did not precipitate the intracerebral hemorrhage that the victim experienced after the incident involving the defendant. Abramovitz provided two reasons as the basis for his conclusion. First, Abramovitz reasoned that spontaneous bleeds associated with amyloid angiopathy typically are much smaller than the intracerebral hemorrhage that the victim experienced after the incident with the defendant. Second, Abramovitz testified that CT scans of persons suffering from amyloid angiopathy generally reveal evidence of prior bleeds, which did not appear in the victim's CT scan.

Malka B. Shah, a forensic pathologist and one of the state's associate medical examiners, performed an autopsy on the victim. Shah testified that the cause of the victim's death was the hemorrhage, which was the result of trauma to the victim's head. In addition, Dean Uphoff, a neuropathologist and consultant to the state medical examiner's office, testified that, although the victim suffered from amyloid angiopathy, the cause of the victim's intracerebral hemorrhage was blunt force trauma.[12] Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court's instructions on the element of proximate cause violated his due process right to a fair trial. Specifically, he

---

[12] Walter Borden, a psychiatrist, testified for the defendant. After being presented with a hypothetical fact pattern based upon the nature and extent of the victim's injuries, Borden opined that it was unlikely that the victim would have suffered significant brain damage. Borden also indicated that the hemorrhage that the victim experienced could have been spontaneous, i.e., not the result of trauma. It was apparent, however, based on Borden's testimony, that he never had examined the victim. Furthermore, Borden acknowledged on cross-examination that he had not reviewed the autopsy report, the neurosurgeon's report, or the victim's CT scan.

contends that the trial court improperly instructed the jury that "[a] defendant takes a victim as he finds him." The defendant asserts that this portion of the court's charge undermined his claim that, because the victim suffered from amyloid angiopathy,[13] his death was not foreseeable. The defendant further asserts that the charge was likely to have confused the jury regarding the state's burden of establishing that he had acted recklessly. We reject the defendant's due process claim.

The following relevant portions of the trial court's instructions are relevant to our review of the defendant's claim. With respect to the element of proximate cause, the trial court instructed the jury as follows: "[An] essential element of the crime of manslaughter . . . is that the defendant's conduct caused the death of another person, [the victim]. The state must prove beyond a reasonable doubt that the defendant caused the death of [the victim]. Proximate cause does not necessarily mean the last act of cause or the act in point of time nearest to the death. The concept of . . . proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of the death. An act or omission to act is a proximate cause of death when it substantially and materially contributes in a natural and continuing sequence unbroken by an efficient intervening cause to the resulting death. It is a cause without which the death would not have occurred and a predominating cause, a substantial factor from which the death following is a natural, direct and immediate consequence. It does not matter whether this particular kind of harm that results in the defendant's act be intended by him. When the death allegedly caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of

[13] See footnote 11 of this opinion.

legal causation unbroken and holds the defendant criminally responsible.

"Every person is held to be responsible for the natural consequences of his acts, and if he commits the alleged striking and death following it, it does not alter its nature or diminish its criminality to produce or cause to produce a reason. A defendant's criminal liability is not lessened because of a preexisting medical condition of an alleged victim. *A defendant takes a victim as he finds him.* In this case, as part of your consideration of the question of proximate cause, you must also consider the doctrine of efficient intervening cause.

"Here the defendant claims that his conduct was not the proximate cause of the victim's death because there was an efficient intervening cause that was the proximate cause of death. This doctrine refers to a situation in which the defendant's conduct is a cause in fact of the victim's death. That is, the victim would not have died but for the defendant's conduct but, nonetheless, some other circumstance occurred and that other circumstance does more than supply a concurring or contributing cause of the death, but is, itself, unforeseeable and sufficiently powerful in its effect that it serves to relieve the defendant of the criminal responsibility for his conduct. In such a case, the defendant's conduct is not the proximate cause of the victim's death.

"Thus, the doctrine of efficient intervening cause serves as a dividing line between two closely related factual situations. One, where two or more acts or forces, one of which was set in motion by the defendant, combined to cause the victim's death, in which case the doctrine will not relieve the defendant of criminal responsibility, and two, where an act or force intervenes in such a way as to relieve a defendant, whose conduct contributed in fact to the victim's death, from responsi-

bility in which case the doctrine of efficient intervening cause will apply.

"It is a question of fact for you the jury to resolve, whether the alleged circumstances constitute a concurring or contributing cause, in which case the defendant will not be relieved of criminal responsibility, or an efficient intervening cause, in which case he will be so relieved. I remind you that the burden remains on the state to prove the defendant's conduct was the proximate cause of the victim's death, as I have just explained proximate cause to you." (Emphasis added.)

Because the crime of manslaughter in the second degree requires proof beyond a reasonable doubt that the defendant "recklessly cause[d] the death of [the victim]"; General Statutes § 53a-56 (a) (1); the trial court instructed the jury on the meaning of recklessness in accordance with General Statutes § 53a-3 (13).[14] The court explained: "A person acts recklessly with respect to a result or to circumstances described by a statute defining an offense when he was aware of and consciously disregarded a substantial and unjustifiable risk that such result will occur or that such circumstances exist. The risk must have been [of] such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

"The standard of conduct of a reasonable person in the same situation as the defendant is the doing of something which a reasonably prudent person would do under the circumstances or omitting to do what

---

[14] General Statutes § 53a-3 provides in relevant part: "(13) A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ."

a reasonably prudent person would not do under the circumstances. A gross deviation is a great or substantial deviation, not just a slight or moderate deviation. There must be a great or substantial difference between, on the one hand, the defendant's conduct in disregarding a substantial and unjustifiable risk and, on the other hand, what a reasonable person would have done under the circumstances. Whether a risk is substantial and unjustifiable is a question of fact for you [the jury] to determine under all of the circumstances."

The defendant first maintains that the court's statement, "[a] defendant takes a victim as he finds him," improperly suggested to the jury that it was free to disregard the defendant's claim that, because the victim suffered from amyloid angiopathy, his death was not a foreseeable consequence of the defendant's conduct. The defendant also raises the related claim that the challenged language was misleading in regard to the element of recklessness because it suggested to the jury that, in determining whether the defendant had acted with an awareness of the requisite risk, it could make that determination without regard to the fact that the defendant was unaware that the victim suffered from amyloid angiopathy.

"Our analysis begins with a well established standard of review. When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will

not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Aponte*, 259 Conn. 512, 517, 790 A.2d 457 (2002).

"To prove causation, the state is required to demonstrate that the defendant's conduct was a proximate cause of the victim's death—i.e., that the defendant's conduct contributed substantially and materially, in a direct manner, to the victim's injuries and that the defendant's conduct was not superseded by an efficient intervening cause that produced the injuries. . . . Proximate cause in the criminal law does not necessarily mean the last act of cause, or the act in point of time nearest to death. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of death. An act or omission to act is the proximate cause of death when it substantially and materially contributes, in a natural and continuous sequence, unbroken by an efficient, intervening cause, to the resulting death. It is the cause without which the death would not have occurred and the predominating cause, the substantial factor, from which death follows as a natural, direct and immediate consequence. . . . It is unnecessary for proximate cause purposes that the particular kind of harm that results from the defendant's act be intended by him. In many situations giving rise to criminal liability, the harm that results is unintended, yet is directly or indirectly caused by an act of the defendant. In such cases, where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible. . . . The defendant's conduct need not be the predominating cause or the substantial factor in bringing about the victim's injuries, [as] long as his conduct was a cause that necessarily set in operation the factors that accomplish the injury."

(Citations omitted; internal quotation marks omitted.) *State* v. *Wassil*, 233 Conn. 174, 181–82, 658 A.2d 548 (1995); see also *State* v. *Leroy*, 232 Conn. 1, 10–11, 653 A.2d 161 (1995) ("If a wound starts in operation a chain of circumstances and conditions which ultimately result in death, then under the law the wound is regarded as the cause of the death. On the other hand, even though death follows a wound, in point of time, if the death is brought about by some cause independent of the wound, if it would have happened, that is, if there had been no wound, then of course the wound is not the cause of the death." [Internal quotation marks omitted.]).

"The doctrine of intervening cause . . . refers to a situation in which the defendant's conduct is a 'but for' cause, or cause in fact, of the victim's injury, but nonetheless some other circumstance subsequently occurs—the source of which may be an act of the victim, the act of some other person, or some nonhuman force—that does more than supply a concurring or contributing cause of the injury, but is unforeseeable and sufficiently powerful in its effect that it serves to relieve the defendant of criminal responsibility for his conduct. . . . Thus, the doctrine serves as a dividing line between two closely related factual situations: (1) where two or more acts or forces, one of which was set in motion by the defendant, combine to cause the victim's injuries, in which case the doctrine will not relieve the defendant of criminal responsibility; and (2) where an act or force intervenes in such a way as to relieve a defendant, whose conduct contributed in fact to the victim's injuries, from responsibility, in which case the doctrine will apply. . . . Furthermore, in a case in which the evidence, viewed in favor of the defendant, justifies an instruction on the doctrine of intervening cause . . . it will ordinarily be a question of fact for the jury, to be resolved pursuant to appropriate

instructions by the trial court, whether the subsequent circumstance constitutes a concurring or contributing cause, in which case the defendant will not be relieved of criminal responsibility, or an efficient, intervening cause, in which case he will be so relieved." (Citations omitted.) *State* v. *Munoz*, 233 Conn. 106, 124–25, 659 A.2d 683 (1995).

Finally, under our Penal Code, "[a] person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ." General Statutes § 53a-3 (13).

Upon application of the foregoing principles, we are persuaded that the challenged portion of the court's instructions, when considered in the broader context of the court's otherwise accurate and thorough charge, was not likely to have misled the jury regarding either the element of proximate cause or the element of recklessness. The trial court's statement that "[a] defendant takes a victim as he finds him" was intended to underscore the principle that, if the evidence established that the defendant's conduct was a "but for" cause of the victim's death, the state was not also required to prove that the defendant's conduct was the sole or even most immediate cause of death.

To be sure, the jury reasonably could have interpreted the challenged language, when considered in isolation from the remainder of the charge, as suggesting that the victim's preexisting condition, namely, amyloid angiopathy, was irrelevant to a determination of the cause of the victim's death or whether the defendant

acted recklessly.[15] Nevertheless, the court's instructions on proximate cause and recklessness were otherwise clear, complete and accurate. In particular, the court carefully instructed the jury on the issues of foreseeability, efficient intervening cause and concurring or contributing cause. Consequently, we fail to see how the challenged language, which was not repeated, could have been confusing to the jury when considered in the context of the entire charge.[16] See, e.g., *State* v. *Ramos*, 261 Conn. 156, 166, 801 A.2d 788 (2002) (when reviewing challenged jury instruction, "[t]he charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge" [internal quotation marks omitted]); *State* v. *Corbin*, 260 Conn. 730, 741, 799 A.2d 1056 (2002) ("[a] charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts" [internal quotation marks omitted]). Because we conclude that there is no reasonable likelihood that the jury was misled regarding the essential elements of the crime of manslaughter, we reject the defendant's contention that he is entitled to a new trial on grounds of instructional impropriety.

II

The defendant next contends that the evidence adduced at trial did not warrant an instruction by the trial court regarding the limitation on the use of deadly physical force by an accused who claims to have acted

[15] Of course, the victim's preexisting condition was not irrelevant in light of the defendant's claims that amyloid angiopathy, and not the blows delivered by the defendant, caused the victim's death, and that the defendant, who was unaware that the victim suffered from a condition that caused him to be susceptible to intracranial bleeding, had not acted recklessly because the victim's death was not a foreseeable consequence of the defendant's conduct.

[16] Because the challenged portion of the instruction, when delivered to a jury in a criminal case, may be misleading if viewed in isolation, we discourage its use in future criminal cases.

in self-defense. The defendant further maintains that the court's instruction in that regard violated his sixth amendment right to present a defense and, in addition, diluted the state's burden of disproving his claim of self-defense beyond a reasonable doubt.[17] We disagree.

At trial, the defendant claimed, pursuant to General Statutes § 53a-19,[18] that he was acting in self-defense when he struck the victim. In accordance with his claim, the court instructed the jury on self-defense. In connection with its instruction on self-defense, the court informed the jury that, under the law of self-defense, "deadly physical force may not be used unless the actor, meaning the defendant, reasonably believes such other person, meaning the victim in this case, is using or about to use deadly physical force or inflicting or about to inflict great bodily harm on him. Deadly physical force means physical force that reasonably can be

---

[17] The defendant contends that the trial court's instruction violated his rights under both the federal and state constitutions. Because the defendant has presented no independent state constitutional analysis, however, we limit our review to his claim under the federal constitution. See, e.g., *State v. Eady*, 249 Conn. 431, 435 n.6, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999).

[18] General Statutes § 53a-19 provides in relevant part: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself . . . from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his . . . place of work and was not the initial aggressor . . . .

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor . . . ."

exerted to cause death or serious physical injury. Serious physical injury means injury which creates a substantial risk of death or that causes serious disfigurement, serious impairment of health or serious loss or impairment of a function of any bodily organ."[19] The defendant asserts that the evidence was insufficient to warrant an instruction on the use of deadly physical force in connection with his claim of self-defense because, according to the defendant, no reasonable juror could have concluded that the blows that he delivered to the victim constituted deadly physical force.

The defendant's claim is belied by a review of the evidence adduced at trial. That evidence established that the defendant was approximately fifty pounds heavier, seven inches taller and over twenty years younger than the sixty-three year old victim. The victim apparently was caught off guard by the two blows, the first of which was delivered with such force that it knocked the victim's hard hat and safety goggles off his head and caused him to fall to one knee. Two eyewit-

---

[19] The trial court further charged the jury on self-defense as follows: "Great bodily harm is not limited by the definition of serious physical injury. It may encompass other acts of the victim. The term 'great' has its ordinary meaning and connotes a bodily harm that is harm and is substantially more than minor or inconsequential harm. The word 'ordinary' has its ordinary meaning. The words 'about to use' have their ordinary meaning and connote an act ready to take place or about to occur and not an act that is to take place at some unspecified future time.

"Now, just because I included that portion of [§] 53a-19 (a), which defines deadly physical force, and have just discussed deadly physical force, that does not mean that deadly physical force applies or does not apply to this case, for that, again, is solely for you to decide. If you find that deadly physical force is not applicable here, you must disregard that portion of these instructions on justification, self-defense concerning deadly physical force, and only determine whether or not reasonable physical force was or was not justified as I am also defining that here. As I said earlier, the defendant does not have to prove that he acted in self-defense, but if self-defense is raised in a case, and it has been raised here, then it is the state's burden to disprove the defense beyond a reasonable doubt as that term has been defined for you."

nesses described the second blow, which drove the victim face first into the concrete floor, in brutal terms. See footnote 9 of this opinion. Moreover, as the jury concluded on the basis of the evidence adduced at trial, the blows caused the victim to suffer a fatal brain hemorrhage. On the basis of the foregoing evidence, we are satisfied that the jury reasonably could have found that the defendant had used deadly physical force in striking the victim and, therefore, the trial court properly delivered an instruction to the jury regarding the limitations on the use of such force in connection with the defendant's claim of self-defense.

### III

The defendant also contends that the state's evidence was insufficient to establish the element of recklessness.[20] Specifically, the defendant claims that the victim's amyloid angiopathy rendered the victim unusually vulnerable to a fatal head injury and, because the defendant was unaware of that condition, the jury reasonably could not have found, on the basis of the defendant's actions, that the defendant had engaged in conduct that he knew created a substantial and unjustifiable risk of causing the victim's death.[21] We disagree.

[20] See footnote 14 of this opinion.

[21] In reviewing a claim of evidentiary insufficiency, "[w]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . .

"While the [trier of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be [proven] beyond a reasonable doubt. . . . If it is reasonable and logical for the [trier] to conclude that a basic fact or an inferred fact is true, the [trier] is permitted to consider the fact proven and may consider it in combination

As we previously have explained; see part II of this opinion; the evidence supported a finding that, under all of the circumstances, including the fact that the defendant was substantially heavier, taller and younger than the victim, the two blows that the defendant delivered to the victim were so forceful as to create a serious risk of death. That same evidence was sufficient to support a finding that the defendant's conduct created a substantial and unjustifiable risk of death irrespective of the victim's amyloid angiopathy, and that the defendant was aware of that risk and consciously disregarded it. The great weight of the evidence adduced at trial established that the victim's amyloid angiopathy did not cause, or even contribute to, the victim's death, but, rather, that the victim's death was caused by blunt force trauma stemming from the two brutal and unexpected blows that the defendant delivered to the victim. The jury reasonably concluded, therefore, that the defendant, in striking the victim as and when he did, did so recklessly, that is, with a conscious disregard of a known, substantial and unjustifiable risk that the victim would die as a result of those blows. We therefore reject the defendant's claim.

## IV

The defendant next contends that the trial court failed to conduct an adequate hearing on his claim of possible

with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [i]n evaluating evidence that could yield contrary inferences, the [trier of fact] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [trier], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Schiappa*, 248 Conn.

juror misconduct in violation of his sixth amendment right to a trial by an impartial jury.[22] We reject this claim.

The following additional facts are relevant to our resolution of this issue. After the jury returned its verdict and prior to sentencing, the defendant filed a motion for a new trial, alleging that he had received information that one of the jurors, B.B.,[23] may have been biased against him. At an evidentiary hearing held by the court on the defendant's motion, the defendant elicited testimony from three witnesses, not one of whom was B.B.

The evidence adduced at the hearing indicated that B.B.'s husband had been involved in a postretirement dispute with the same union to which the defendant belonged.[24] As a result of this dispute, B.B.'s husband's supplementary union pension benefit of approximately $70 per month temporarily was suspended.[25] B.B.'s husband traveled to the union office to protest the suspension of his benefit payments. After he lodged his protest, the payments were reinstated.[26] B.B.'s husband suffered a total loss of $140 as a result of the dispute.

132, 177–78, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999).

[22] The defendant also claims a violation of his state constitutional right to a trial by an impartial jury; Conn. Const., art. I, § 8; but has failed to provide an independent analysis of his claim. Accordingly, we review only his claim under the federal constitution. See footnote 17 of this opinion.

[23] We use the initials of the juror to protect the juror's legitimate privacy interests. See, e.g., *State* v. *Hodge*, 248 Conn. 207, 229 n.25, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

[24] As we indicated previously in this opinion, the defendant was a union steward.

[25] The dispute apparently arose from a claim by the union that B.B.'s husband was continuing to work in the electrical trade subsequent to his retirement.

[26] One of the witnesses who testified at the hearing indicated that he believed that B.B. had accompanied her husband to the union office, but acknowledged that he did not have personal knowledge that she did so.

The evidence also indicated that B.B. previously had been acquainted with Richard McCombs, a defense witness who had testified at trial regarding certain union issues, the defendant's role in several controversies at Electric Boat and the defendant's reputation as a nonviolent person. McCombs testified at the hearing on the defendant's motion for a new trial that he and B.B. had become acquainted with one another approximately twenty-five to thirty years earlier. According to McCombs, he had been friendly with B.B.'s nephew in the early 1970s and believed that B.B. disliked him because she felt that McCombs had played a role in encouraging B.B.'s nephew to divorce his wife. McCombs acknowledged, however, that B.B. never had indicated that she blamed him for her nephew's divorce and also acknowledged that she never had expressed any animosity toward him. McCombs added that he had not seen B.B. in approximately fifteen years and, further, that he did not recognize her in the jury box when he testified at the defendant's trial.

At the conclusion of the hearing, the defendant claimed that the evidence raised questions as to B.B.'s impartiality. The defendant further claimed that, in light of the evidence presented at the hearing, B.B.'s testimony was necessary to the resolution of those questions. The trial court disagreed with both of the defendant's claims, concluding that the evidence adduced at the hearing did not support any basis for inferring that B.B. might have been biased against the defendant or that she otherwise might not have been a fair and impartial juror. The court therefore denied the defendant's request for permission to call B.B. to testify at the hearing and his motion for a new trial.

"The law relating to alleged juror misconduct is well settled. Jury impartiality is a core requirement of the right to trial by jury guaranteed by . . . the sixth amendment to the United States constitution. . . .

[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . .

"To ensure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment . . . a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality. . . . We previously have instructed that the trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jury misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations of jury misconduct; and (3) the state's interests of, inter alia, jury impartiality, protecting jurors' privacy and maintaining public confidence in the jury system." (Internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 447–48, 778 A.2d 812 (2001).

"Furthermore, we determined that [a]lthough the form and scope of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jur[or] misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of

proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto." (Internal quotation marks omitted.) *State* v. *Centeno*, 259 Conn. 75, 82, 787 A.2d 537 (2002).

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of [juror bias or] misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them. . . . Consequently, the trial court has wide latitude in fashioning the proper response to allegations of juror bias. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. . . . Although we recognize that trial [c]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . Ultimately, however, [t]o succeed on a claim of [juror] bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact. . . . Finally, when . . . the trial court is in no way responsible for the alleged juror misconduct, the defendant bears the burden of proving that the misconduct actually occurred and resulted in actual prejudice." (Citation omitted; internal quotation marks omitted.) *State* v. *Feliciano*, supra, 256 Conn. 448–49.

We conclude that the defendant has failed to establish either that the trial court abused its discretion in precluding the defendant from calling B.B. to testify at

the hearing or that the court improperly denied the defendant's motion for a new trial on the ground of juror misconduct. The fact that B.B.'s husband had a minor disagreement with the defendant's union that resulted in a total forfeiture of $140 in supplementary pension benefits cannot even support an inference that B.B. *might* have been biased against the defendant. The same must be said of the defendant's allegation concerning B.B.'s bias against McCombs, who had not seen B.B. in fifteen years and whose belief that, approximately twenty to thirty years ago, B.B. may not have liked him was highly speculative. Thus, as the trial court concluded, the evidence adduced by the defendant in support of his motion for a new trial was insufficient to give rise to any reasonable inference that B.B. was biased against the defendant or McCombs. Consequently, the trial court acted well within its discretion in concluding that B.B.'s testimony was unnecessary to the resolution of the defendant's claim of juror misconduct; cf. *State* v. *Brown*, 235 Conn. 502, 531, 668 A.2d 1288 (1995) (after verdict has been accepted, state has strong interest in preventing juror harassment); and in concluding that no further inquiry was either necessary or appropriate. Because we conclude that the trial court's inquiry was sufficient to allay any possible concerns about B.B.'s impartiality, we also conclude that the court properly denied the defendant's motion for a new trial.

## V

The defendant next claims that the trial court improperly granted the state's motion in limine through which the state sought to preclude the defendant from impeaching one of the state's witnesses with evidence of prior felony convictions. We disagree.

The following additional facts are necessary to our review of this claim. Robert Perkins, a coworker of

the defendant and the victim, witnessed the defendant strike the victim. Perkins, who had worked at Electric Boat for over twenty years, testified for the state at the defendant's trial concerning the defendant's attack of the victim.

Prior to the presentation of the state's case-in-chief, the state made a motion in limine seeking to preclude the defendant from cross-examining Perkins about Perkins' prior felony convictions. Perkins had three prior felony convictions, all of which were for breaking and entering and larceny. Two of Perkins' convictions dated back to 1961, and the third dated back to 1965.[27] The state maintained that the probative value of those convictions was outweighed by their prejudicial effect and their remoteness. See Conn. Code Evid. § 6-7 (a).[28] The court granted the state's motion.

The principles governing our review of the defendant's claim are well established. "The credibility of a witness may be attacked by introducing the witness' conviction of a crime if the maximum penalty for that conviction is imprisonment exceeding one year. See

---

[27] Perkins apparently was sentenced to a maximum term of fourteen years imprisonment for his last conviction in 1965. It is unclear from a review of the record when Perkins was released from confinement in connection with that conviction but, even if we assume that he had served his entire sentence, he would have been eligible for release in 1979, twenty-two years before Perkins was called to testify in the present case. See Conn. Code Evid. § 6-7 (a) commentary (later of date of conviction or date of release from confinement imposed in connection with conviction relevant to determination of remoteness).

[28] Section 6-7 (a) of the Connecticut Code of Evidence provides: "For the purpose of impeaching the credibility of a witness, evidence that a witness has been convicted of a crime is admissible if the crime was punishable by imprisonment for more than one year. In determining whether to admit evidence of a conviction, the court shall consider:

"(1) The extent of the prejudice likely to arise,

"(2) the significance of the particular crime in indicating untruthfulness, and

"(3) the remoteness in time of the conviction."

General Statutes § 52-145 (b);[29] [Conn. Code Evid. § 6-7 (a)]. . . . Recognizing that the inherent authority of the trial court to exclude evidence whe[n] its prejudicial tendency outweighs its probative value is particularly applicable to prior convictions otherwise qualifying for admission . . . [t]hree factors have . . . been identified as of primary importance in considering whether a former criminal conviction is to be admitted: (1) the extent of the prejudice likely to arise; (2) the significance of the commission of the particular crime in indicating untruthfulness; and (3) its remoteness in time. . . . Moreover, [a]lthough we have left to the trial court the responsibility for determining whether, in a particular case, a witness' criminal conviction may be excluded on the [ground] that it is too old, we have sanctioned a general guideline for the determination of remoteness that parallels rule 609 (b) of the Federal Rules of Evidence.[30] Rule 609 (b) establishes a ten year limitation from conviction or release from resulting confinement upon the use of the conviction for impeachment purposes unless the probative value of the conviction substantially outweighs its prejudicial effect. . . . We have recognized, however, that convictions having some special significance upon the issue of veracity surmount the standard bar of ten years and qualify for the balancing of probative value against prej-

---

[29] General Statutes § 52-145 (b) provides: "A person's interest in the outcome of the action or his conviction of crime may be shown for the purpose of affecting his credibility."

[30] Rule 609 (b) of the Federal Rules of Evidence provides in relevant part: "Evidence of a conviction . . . is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release . . . from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. . . ."

"We have noted that this federal standard is not our own, but rather serves as a rough bench mark in deciding whether trial court discretion has been abused . . . ." (Internal quotation marks omitted.) *State* v. *Carter*, 228 Conn. 412, 431 n.19, 636 A.2d 821 (1994).

udice. . . . Finally, [w]e will not disturb the trial court's determination as to the admissibility of a prior conviction to impeach a witness absent an abuse of discretion . . . and a showing by the defendant of substantial prejudice or injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Askew*, 245 Conn. 351, 360–61, 716 A.2d 36 (1998); see also Conn. Code Evid. § 6-7 (a).

As the defendant asserts, the crimes underlying Perkins' convictions are probative of lack of honesty. *State* v. *Askew*, supra, 245 Conn. 363–64. We agree with the state, however, that the probative value of Perkins' convictions is minimal, if not negligible, in view of the long span of time between the convictions[31] and the proffered testimony. The trial court, therefore, reasonably concluded that the convictions, although otherwise probative of untruthfulness, were too remote to bear materially on Perkins' veracity as a witness.[32] We note, moreover, that Perkins was only one of several eyewitnesses to testify about the incident involving the defendant and the victim, and the defendant did not seriously contest the credibility of any of them, including Perkins. Consequently, we conclude that the trial court did not abuse its discretion in granting the state's motion in limine.

VI

The defendant's final claim is that the trial court improperly permitted the state to introduce into evidence a photograph of the victim for the purpose of demonstrating his size and physical condition. Specifically, the defendant contends that the probative value

[31] See footnote 27 of this opinion.

[32] The defendant claims that the trial court improperly failed to consider the probative value of Perkins' convictions and granted the state's motion in limine solely on account of remoteness. To the contrary, the court expressly noted that, in making its ruling, it was required to balance the probative value of the convictions against their prejudicial effect.

of the photograph, which depicts the victim and his wife at a beach, was outweighed by the risk of unfair prejudice and, consequently, that it should have been excluded pursuant to § 4-3 of the Connecticut Code of Evidence.[33] We disagree.

"Before addressing the merits of the defendant's [claim], we . . . set forth the well established principles that govern our analysis of those claims. This court has consistently held that photographic evidence is admissible where the photograph has a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry. . . . [Moreover] [t]here is no requirement . . . that a potentially inflammatory photograph be essential to the state's case in order for it to be admissible; rather, the test for determining the admissibility of the challenged evidence is relevancy and not necessity. . . . Thus, although irrelevant evidence of [an inflammatory] character is inadmissible, [t]he [state], with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the [ability] to prove every essential element of the crime by the most convincing evidence it is able to produce. . . . Accordingly, [a] potentially inflammatory photograph may be admitted if the court, in its discretion, determines that the probative value of the photograph outweighs the prejudicial effect it might have on the jury. . . . Furthermore, a trial court has broad discretion in weighing the potential prejudicial effect of a photograph against its probative value. . . . On appeal, we may not disturb . . . [the trial court's] finding absent a clear abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 574–75, 710 A.2d 1348 (1998).

[33] Section 4-3 of the Connecticut Code of Evidence provides: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

In rejecting the defendant's claim that the state should have been precluded from using the photograph of the victim and his wife, the trial court concluded that "the photograph [did not have] *any* prejudicial effect." (Emphasis added.) The court further concluded that, even if the photograph did give rise to some marginal prejudice, "its probative value far outweigh[ed] any claim of prejudicial effect."

The defendant does not dispute that the victim's height, weight, age and physical condition were relevant to the contested issues of whether the defendant acted recklessly when he delivered the blows that led to the victim's death and whether the defendant was acting in self-defense when he struck the victim. Nor does the defendant dispute that the photograph accurately depicts those characteristics of the victim. Thus, the defendant does not challenge the relevancy of the photograph. The defendant contends, rather, that the photograph was so likely to evoke sympathy for the victim that the trial court reasonably could not have concluded that its probative value was outweighed by its prejudicial effect.

The defendant cannot prevail on his claim. Although the photograph depicts the victim and his wife with a beach in the background, there is nothing particularly provocative or inflammatory about the scene. The fact that the victim appears in a relaxed and happy pose with his wife simply does not, without more, render the photograph unfairly prejudicial. Moreover, efforts were made to limit any potential, albeit minimal, prejudice that might have flowed from the admission of the photograph. Specifically, when the state's attorney published the photograph to the jury, he explained that it "generally [depicts the victim] as he appeared in terms of size, weight and other physical characteristics at the time of his death." Thereafter, the trial court told the jury that "the state's attorney has indicated for you the

purpose of the photograph and the photograph is to be used *only for that purpose.*" (Emphasis added.) The court also instructed the jury at the close of the case that sympathy was to play no role in its deliberations. For the foregoing reasons, the defendant has failed to establish that he suffered any unfair prejudice as a result of the state's use of the photograph. Accordingly, we conclude that the trial court did not abuse its discretion in permitting the state to introduce the photograph into evidence.[34]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[34] We note that the trial court did preclude the state from introducing into evidence another photograph with which the state sought to establish the victim's size and physical condition. The excluded photograph depicted the victim posing with five family members, including two children, in front of a mantle containing holiday cards and Christmas stockings. The court concluded that the admission of the photograph depicting the victim with his family in a holiday setting "would be prejudicial."