## LABEL SYSTEMS CORPORATION *v.* SAMAD AGHAMOHAMMADI ET AL.
## (SC 17125)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

---

Argued March 24—officially released July 27, 2004

*Alexander J. Trembicki*, with whom was *Thomas B. Lynch*, for the appellants-appellees (plaintiff and third party defendant Kenneth P. Felis).

*Stephen E. Pliakas*, with whom was *Jeffrey J. Tinley*, for the appellees-appellants (defendants).

*Opinion*

NORCOTT, J. This appeal arises out of the internecine dispute between two former employees, the defendants, Samad Aghamohammadi and Pamela Markham, and their former employer, the plaintiff, Label Systems Corporation (Label Systems), as well as its president, Kenneth P. Felis. Label Systems commenced this action against the defendants,[1] who counterclaimed against Label Systems and filed a third party complaint against Felis.[2] A jury found the defendants liable for conversion, and awarded Label Systems compensatory and punitive damages. In addition, the jury found Label Systems and Felis[3] liable for vexatious litigation in relation to a prior action, and awarded the defendants compensatory damages. The trial court rendered judgment in accordance with the jury's verdict. The plaintiffs appealed, and the defendants cross appealed to the Appellate Court, and we transferred both appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the plaintiffs claim that the trial court improperly failed to set aside the jury's finding on the

---

[1] Label Systems also named Henry A. Behre, Jr., and Fred Parker as defendants in their complaint. The claims against both Behre and Parker were withdrawn prior to trial, and they are not parties to this appeal. Hereafter, all references to the defendants are to Aghamohammadi and Markham.

[2] The defendants also named RPM, Inc., the parent company of Label Systems, as a defendant in the third party complaint. On August 11, 1999, the trial court granted the motion to dismiss filed by RPM, Inc., for lack of personal jurisdiction. The propriety of that ruling is not before us in this appeal.

[3] Hereafter, all subsequent references to the plaintiffs are to Label Systems and Felis jointly.

vexatious litigation claim because: (1) there was, as a matter of law, probable cause for the plaintiffs to engage in litigation; and (2) it was inconsistent with the jury's other findings. In addition, the plaintiffs claim that the trial court improperly: (1) denied their motion in limine regarding the admissibility of Felis' prior criminal convictions, and failed to grant a mistrial after the defendants violated the court's order in connection with the same; (2) failed to set aside or reduce the compensatory damages awarded to the defendants; and (3) limited Label Systems' award of punitive damages to $19,303.13 in attorney's fees.[4] In their cross appeal, the defendants claim that: (1) the trial court improperly denied their motion for a directed verdict and motion for judgment notwithstanding the verdict on Label Systems' conversion claim; (2) the trial court abused its discretion by awarding excessive attorney's fees as punitive damages; and (3) the amount of punitive damages awarded violated the due process clause of the fourteenth amendment of the United States constitution. We reject each claim raised on appeal and on the cross appeal, and, accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Label Systems, a corporation located in Bridgeport, is in the business of manufacturing and producing, among other things, labels, stickers and holograms. The defendants are a married couple, both of whom were employed by Label Systems. Aghamohammadi, an immigrant from Iran, began his employment with Label Systems in 1985, and advanced during his tenure to the position of head of the finishing department. In that capacity, Aghamohammadi was responsible for the examination and inspection of finished products for

---

[4] The trial court awarded Label Systems $19,460.17 in punitive damages, of which $19,303.13 was awarded for attorney's fees and $157.04 was awarded in costs. Label Systems' challenge focuses solely on the amount awarded for attorney's fees.

defects, packaging finished products for shipment and shipping products to customers. Markham began her employment at Label Systems in 1982, and served as the office manager and bookkeeper, where she was primarily responsible for paying Label Systems' bills, managing its finances, and overseeing its medical plan. Both defendants were regarded as valuable and trusted employees by Felis. During their employment, the defendants were provided with a company car, which they used for their commute from Waterbury to Bridgeport. In November, 1992, while driving the company car, their sole means of transportation, the defendants were rear-ended by another car. Subsequently, the defendants received a check in the amount of $1095.01 from the tortfeasor's insurance company. Because Markham was nearing the end of a difficult pregnancy, her first, the defendants did not want to be without the car, and they chose to delay having it repaired until after her delivery. Accordingly, the defendants cashed the insurance check and deposited the proceeds into their personal checking account. In early 1993, Felis equipped the defendants' house with computer equipment so that Markham could work from home after the baby was born, and he built and furnished a nursery in the office for Markham to use after she returned to work.

On February 15, 1993, upon their arrival at work, the defendants were met outside by Felis and other members of his staff. Felis gave the defendants letters of termination that accused them of wilful and felonious misconduct in the course of their employment,[5] termi-

---

[5] The letters specifically stated: "You are hereby discharged from Label Systems Corporation for willful and felonious misconduct relating to misappropriation of company information, property and a gross breach of your duty to the company. Termination is effective *immediately*. Any and all property of the company in your possession including but not limited to automobiles, records, office equipment and product (stickers, holograms, etc.) must be returned to the company at once. A team of company employees will be dispatched to your residence for this purpose." (Emphasis in original.)

nated their employment, and refused to allow them to enter the facility to collect their personal belongings. The defendants surrendered the company car to Felis, and departed in an awaiting limousine, which had been arranged for by Felis. Later that evening, Aghamoham-madi was arrested based upon Felis' claim that Aghamo-hammadi had threatened him when receiving his letter of termination. Label Systems immediately stopped pay-ing a salary to both defendants, and terminated their health insurance.

On February 23, 1993, Markham gave birth to the defendants' first child. On March 10, 1993, Label Sys-tems filed a three count complaint against the defen-dants, alleging conversion, breach of duties of loyalty and appropriation of trade secrets. The defendants had requested unemployment benefits immediately follow-ing their termination, and on April 7, 1993, over the objection of Label Systems, separate awards of unem-ployment benefits were made to both defendants. The defendants were unable to extend their health insur-ance at their own expense, however, because of the alleged wilful and felonious misconduct underlying the termination of their employment. On April 22, 1993, Felis, on behalf of Label Systems, appealed from the decisions awarding unemployment benefits to the defendants, claiming that the defendants were termi-nated for wilful and felonious misconduct, and, there-fore, that they were precluded from receiving such benefits. Over the course of the next four months, three separate hearings were held in which the plaintiffs offered testimony and evidence in support of their claim of wilful and felonious misconduct by the defendants. On August 18, 1993, after the third hearing, both appeals were unilaterally withdrawn by the plaintiffs.

In April, 1994, in response to the withdrawal of the appeals, the defendants counterclaimed against Label Systems, and filed a third party complaint against Felis,

both of which alleged vexatious litigation, abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, slander per se, slander, interference with contractual relations, wrongful discharge and intentional interference with prospective contractual relations. In July, 2001, the actions proceeded to trial, where the jury found the defendants liable for conversion, rejected all of Label Systems' remaining claims, and awarded Label Systems $50 in compensatory damages. In addition, the jury found that the defendants had converted Label Systems' property under circumstances warranting punitive damages, in an amount to be set by the trial court according to the prior agreement of the parties. In regard to the counterclaims and third party complaint, the jury found the plaintiffs liable for vexatious litigation, rejected all of the remaining claims, and awarded Markham $160,000 and Aghamohammadi $60,000 in compensatory damages. These awards were doubled automatically pursuant to General Statutes § 52-568 (1),[6] which provides for the doubling of damages for groundless or vexatious actions. The trial court denied several post-trial motions filed by both parties, awarded Label Systems $19,460.17 in punitive damages, and rendered judgment in accordance with the jury's verdict. This appeal followed.

I

As noted previously, the jury found that the plaintiffs had engaged in vexatious litigation[7] when they pursued

---

[6] General Statutes § 52-568 provides in relevant part: "Any person who commences and prosecutes any civil action or complaint against another, in his own name or the name of others, or asserts a defense to any civil action or complaint commenced and prosecuted by another (1) without probable cause, shall pay such other person double damages . . . ."

[7] "[A] claim for vexatious litigation requires a plaintiff to allege that the previous lawsuit was initiated maliciously, without probable cause, and terminated in the plaintiff's favor." (Internal quotation marks omitted.) *Zeller* v. *Consolini*, 235 Conn. 417, 424, 667 A.2d 64 (1995).

an administrative appeal from the awards of unemployment benefits made to the defendants based upon an allegation of wilful and felonious misconduct.[8] On appeal, the plaintiffs claim that the trial court improperly denied their motion for a directed verdict on the vexatious litigation claim. Specifically, the plaintiffs claim that they had probable cause as a matter of law to appeal from the unemployment awards based upon a claim of wilful and felonious misconduct by the defendants.[9] The defendants contend that the trial court prop-

[8] The "initiation, continuation or procurement of civil proceedings against another before an administrative board that has power to take action adversely affecting the legally protected interests of the other" permits liability for vexatious litigation. (Internal quotation marks omitted.) *DeLaurentis* v. *New Haven*, 220 Conn. 225, 248, 597 A.2d 807 (1991). In *DeLaurentis*, the party that had initiated the administrative action without probable cause was found liable in the plaintiff's subsequent vexatious litigation action. Id., 227–28. In the present case, the defendants initiated the administrative action by filing for unemployment benefits, from which the plaintiffs then appealed based on an allegation of wilful and felonious misconduct by the defendants. The plaintiffs have not challenged the application of *DeLaurentis* to the present case, and, therefore, we need not decide whether a defense asserted in an appeal from an administrative action instituted by another party can give rise to a claim of vexatious litigation.

[9] Within their argument concerning the denial of their motion for a directed verdict, the plaintiffs challenge the trial court's interpretation of General Statutes § 31-236 (a) (2) (B) and its subsequent charge to the jury on vexatious litigation, which precluded the jury from considering evidence that Felis had obtained *after* the defendants were terminated on the issue of whether the plaintiffs had probable cause to appeal the unemployment awards based upon an allegation of wilful and felonious misconduct. The plaintiffs failed to identify this claim as an issue for our review in either their preliminary statement of the issues or within the statement of the issues set forth in their brief. See Practice Book § 67-4 (a). Further, in their brief to this court, the plaintiffs have failed to set forth the appropriate standard of review for a claim of improper jury instruction, have failed to identify the relevant portion of the charge as requested, have failed to identify the relevant portion of the charge as given, and have failed to support their claim with appropriate references to the record. Accordingly, we conclude that the plaintiffs have failed to properly present their challenge to the jury instructions, and we decline to address it in this appeal. See Practice Book § 67-4 (d); see also *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 44–45, 699 A.2d 101 (1997) ("[w]e are not required to review issues that have been improperly presented to this court through an inadequate brief").

erly denied the motion for a directed verdict. We agree with the defendants.

It is well established that "[o]ur review of a trial court's refusal to direct a verdict or to render judgment notwithstanding the verdict takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . [and] giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Citation omitted; internal quotation marks omitted.) *Cohen* v. *Yale-New Haven Hospital*, 260 Conn. 747, 761, 800 A.2d 499 (2002).

In regard to the appeal from Markham's award, the plaintiffs advanced two reasons supporting their belief, prior to the time of termination, that Markham had engaged in wilful and felonious misconduct. First was Felis' belief that Markham had met with Henry J. Behre, Jr., a former employee of Label Systems, and provided him with confidential company information to assist him with his arbitration action then pending against Label Systems for back wages. As the trial court properly noted, however, the jury reasonably could have credited Markham's testimony that she had never disclosed any confidential information to Behre, as well as Behre's testimony that Felis had disclosed the information to Behre in earlier conversations. In addition, it was well within the province of the jury not to credit the testimony of Felis. Second was Felis' belief that Markham had leaked information to Behre concerning a financial investment made in Label Systems by RPM, Inc. (RPM). The jury reasonably could have declined to credit this testimony, and instead credit the testi-

mony of Behre that Felis not only told him of RPM's investment in Label Systems, but that the letter that had terminated his employment relationship with Label Systems had the logo of both companies at the top of the page, thereby making the relationship between the companies obvious. This letter was admitted into evidence, and the jury was able to examine it firsthand. Indeed, Felis testified that in 1992, RPM had circulated a memo to all of its operating companies, including Label Systems, that highlighted RPM's concern with having its logo directly next to each individual operating company's logo on items such as stationery and invoices.

In regard to the appeal from Aghamohammadi's award, Felis testified that, at the time of Aghamohammadi's termination, Felis believed that Aghamohammadi was responsible for an alleged shortage of materials at Label Systems, and that Aghamohammadi was a partner with Behre in an undisclosed business venture, Mecca Trading and Shipping (Mecca). With respect to Mecca, Aghamohammadi testified that he had disclosed Mecca to Felis previously, had offered to make Felis a partner in the business, and that Felis allowed him to make limited use of Label Systems equipment and facilities in his spare time for activities relating to Mecca. To the contrary, Felis testified that Aghamohammadi never disclosed Mecca's existence to him, and that he discovered Mecca's existence just prior to terminating the defendants. It was entirely reasonable, therefore, for the jury to credit Aghamohammadi's testimony over Felis' testimony. With respect to the alleged shortage of materials, Aghamohammadi testified that he was not responsible for any alleged shortage, and that he never stole or misappropriated any material from Label Systems. Indeed, Felis testified that he could not identify whether the alleged shortages

occurred with raw product, partially finished product or finished product.

In sum, our review of the record reveals that there was sufficient evidence from which the jury could "reasonably and legally have reached their conclusion." (Internal quotation marks omitted.) Id., 761. Accordingly, we conclude that the trial court did not abuse its discretion in denying the plaintiffs' motion for a directed verdict on the vexatious litigation claim.

## II

The plaintiffs' next claim is that the trial court improperly failed to grant their motion to set aside the jury's finding that they were liable for vexatious litigation because it is inconsistent with the jury's finding that the defendants were liable for conversion. We disagree.

The proper appellate standard of review when considering the action of a trial court in granting or denying a motion to set aside a verdict is the abuse of discretion standard. *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 276, 828 A.2d 64 (2003); *State* v. *Hammond*, 221 Conn. 264, 267–70, 604 A.2d 793 (1992). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 186, 842 A.2d 568 (2004); *State* v. *Fitzgerald*, 257 Conn. 106, 112, 777 A.2d 580 (2001).

"[I]n civil cases when a verdict rests upon a factual finding contradictory to another finding of the same issue by the trier the judgment cannot stand." *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 577, 479 A.2d 781 (1984). The plaintiffs' claim that the jury's finding that they were liable for vexatious litigation is

inconsistent with the jury's finding that the defendants were liable for conversion fails because of the separate evidentiary bases underlying the two findings. The trial court instructed the jury that probable cause, for purposes of a claim for vexatious litigation concerning appeals from awards of unemployment benefits, was to be measured by the objective evidence held by the plaintiffs at the time of the defendants' termination, and not from the time of the initiation of the appeals.[10] See footnote 9 of this opinion. Our review of the record reveals that the jury was not instructed on any similar time constraint for the conversion claim.[11] Consequently, under the trial court's instructions in the present case, the jury properly could have considered any evidence acquired after the defendants' termination in the context of the conversion claim, but not on the vexatious litigation claim. At trial, the defendants testified that they had informed Felis of the accident, and that they had received the insurance check and would

[10] Specifically, the trial court instructed the jury as follows: "Probable cause may be defined as the knowledge of facts or information sufficient to justify a belief by a reasonable person that there are reasonable grounds for instituting a lawsuit." Applying that definition to the charge of vexatious litigation, the court further instructed the jury: "The question presented on the issue of lack of probable cause . . . is whether [the plaintiffs] had sufficient information *at the moment they terminated the defendants* to justify a belief by a reasonable person that they or either of them had engaged in felonious conduct or . . . wilful misconduct in the course of his or her employment." (Emphasis added.) As noted previously; see footnote 9 of this opinion; the plaintiffs failed to properly preserve their challenge to this instruction for appeal. Therefore, we note that we are not deciding whether the trial court's interpretation of General Statutes § 31-236 (a) (2) (B) was correct, but merely concluding that the jury's verdict was not inconsistent under the specific instructions given by the trial court.

[11] Generally, the trial court's instructions to the jury on conversion provided: "Now in this claim of conversion . . . the measure of compensatory damages is not the full value of the converted proceeds because the plaintiffs agree that the proceeds were ultimately paid over to [Label Systems] at some time after the start of the unemployment compensation appeal. The measure of [Label Systems'] loss, if any, is therefore simple interest on the total amount of the converted proceeds at a rate of 10 percent per year for the period of their wrongful retention."

keep the proceeds until such time after Markham's delivery when they could have the car repaired. To the contrary, Felis testified that he had learned of the defendants' possession of the insurance proceeds only after their termination. By finding the defendants liable for conversion, it is implicitly demonstrated that the jury credited Felis' testimony over the defendants' testimony, as the defendants' possession of the proceeds must have been unauthorized to support the conversion claim. See part VI B of this opinion. Put another way, the jury necessarily found that the defendants had not informed Felis of the insurance proceeds prior to their termination, thereby making their retention of the monies unauthorized. Because Felis was made aware of this conversion *after* the defendants' termination, it could not have been evidence in his possession at the time of the terminations, and, therefore, it could not support a claim of wilful and felonious misconduct.[12]

### III

The plaintiffs' next claim is that the trial court improperly denied their motion in limine seeking to preclude the defendants from admitting evidence of Felis' prior criminal convictions to impeach his credibility because of their remoteness. The defendants contend that the trial court properly denied the motion in limine. We agree with the defendants.

The following additional facts are relevant to our resolution of this claim. In 1986, Felis was convicted of forty-one felonies in federal court, including mail fraud, wire fraud, conspiracy and securities fraud in violation of Rule 10b-5 of the Securities and Exchange

---

[12] Within this claim, the plaintiffs also loosely allege an inconsistency between the portion of the jury verdict finding the plaintiffs' liable for vexatious litigation and the portion of the verdict finding them not liable for wrongful termination. Because this claim was not properly briefed, we decline to address it. See footnote 9 of this opinion; see also *Collins* v. *Anthem Health Plans, Inc.*, 266 Conn. 12, 54, 836 A.2d 1124 (2003).

Commission.[13] After a lengthy set of appeals, Felis' convictions ultimately were upheld by the United States Supreme Court,[14] and in 1988, he paid a $25,000 fine and served his sentence of confinement on the weekends for a period of six months. Prior to trial in the present case, the plaintiffs filed a motion in limine seeking to preclude the defendants from admitting evidence of Felis' prior criminal convictions. After extensive arguments and briefing from both parties, the trial court ruled that the convictions were admissible solely for the purpose of impeaching Felis' credibility as a witness. In so doing, however, the trial court stressed that the use of the convictions for any other purpose "would be to invite a mistrial motion and a mistrial ruling" by the court.[15]

When ruling on the plaintiffs' motion in limine, the trial court first determined that in order to use a convic-

[13] "Felis . . . [was] convicted of violating § 10 (b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U.S.C. § 78j (b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (1987) . . . [and was] also found guilty of violating the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, and [was] convicted for conspiracy under 18 U.S.C. § 371." (Citation omitted.) *Carpenter* v. *United States*, 484 U.S. 19, 20–22, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987).

[14] See *Carpenter* v. *United States*, 484 U.S. 19, 24, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987) ("The [c]ourt is evenly divided with respect to the convictions under the securities laws and for that reason affirms the judgment below on those counts. For the reasons that follow, we also affirm the judgment with respect to the mail and wire fraud convictions.").

[15] The trial court noted: "It's important, however, for the [c]ourt to note that the crimes would be identified by name and would be limited in terms of their publication to the jury to those limited facts that are permitted under our case law and our rule. That's it.

"The [c]ourt would note that they may absolutely not be used to argue a general bad character. They may only be used in the very narrow functional sense of casting doubt on his credibility as a witness by virtue of the fact that he is a convicted felon who has committed crimes especially probative of lack of veracity. It would be to invite a mistrial motion and a mistrial ruling to argue them for any other purpose without bringing to the [c]ourt's attention at the bench reasons why something has changed and a request for permission to do so, which is what I would expect of competent counsel and counsel before me is very competent counsel, so I would expect no less . . . ."

tion that is more than ten years old to impeach credibility, the court must be satisfied that its probative value substantially outweighs its prejudicial effect. The trial court found that the evidence of Felis' prior convictions met this standard, and denied the plaintiffs' motion. On appeal, the plaintiffs claim that the trial court abused its discretion in finding that the evidence met this standard. The plaintiffs' argument illuminates confusion within our case law over the proper standard to apply to prior convictions that are more than ten years old. Accordingly, we take this opportunity to clarify the proper standard by which our courts are to pass upon the admissibility of remote prior convictions in order to impeach the credibility of a witness.

Generally, evidence that a witness has been convicted of a crime is admissible to impeach his credibility if the crime was punishable by imprisonment for more than one year. General Statutes § 52-145 (b); Conn. Code Evid. § 6-7 (a). In determining whether to admit evidence of a conviction, the court shall consider: (1) the extent of the prejudice likely to arise; (2) the significance of the particular crime in indicating untruthfulness; and (3) the remoteness in time of the conviction. Conn. Code Evid. § 6-7 (a); see *State* v. *Nardini*, 187 Conn. 513, 522, 447 A.2d 396 (1982) (recognizing same three part test at common law prior to adoption of Connecticut Code of Evidence). "Moreover, [i]n evaluating the separate ingredients to be weighed in the balancing process, there is no way to quantify them in mathematical terms." (Internal quotation marks omitted.) *State* v. *Askew*, 245 Conn. 351, 370, 716 A.2d 36 (1998). Therefore, "[t]he trial court has wide discretion in this balancing determination and every reasonable presumption should be given in favor of the correctness of the court's ruling . . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation

marks omitted.) *State* v. *Rivera*, 221 Conn. 58, 72–73, 602 A.2d 571 (1992).

In *State* v. *Nardini*, supra, 187 Conn. 520, the defendant claimed that the trial court improperly had allowed the state to admit evidence of his twenty-one year old conviction for carrying a pistol without a permit and his twenty-six year old conviction for breaking and entering. Specifically, the defendant claimed that the trial court abused its discretion because the convictions were too remote in time and had insignificant bearing upon his credibility. Id., 521. We concluded that the trial court improperly had admitted evidence regarding the conviction for carrying a pistol without a permit because any significance it had upon the defendant's credibility "must have entirely dissipated by the date of trial . . . ." Id., 530. Nevertheless, we found the error to be harmless. Id. In our analysis of the defendant's remoteness claim, we noted that both rule 609 of the Federal Rules of Evidence[16] and rule 609 of the Uniform Rules of Evidence contained a ten year limitation on the use of prior convictions. In addition, we noted that, "[u]nder the federal standard, rule 609 (b), *which is not ours* but may serve as a *rough bench mark* in deciding whether trial court discretion has been abused, convictions having some special significance upon the issue of veracity surmount the standard bar of ten years and qualify for the balancing of probative value against prej-

---

[16] Rule 609 (a) (2) of the Federal Rules of Evidence provides that, for the purposes of attacking the credibility of a witness, "evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment."

The admissibility of such evidence is tempered, however, by subsection (b) of rule 609 of the Federal Rules of Evidence, which provides in relevant part: "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. . . ."

udice." (Emphasis added.) Id., 526. As the plaintiffs correctly contend, we subsequently have stated that while "[t]he determination of remoteness is left to the sound discretion of the trial court . . . we have sanctioned a general guideline for the determination of remoteness that parallels rule 609 (b) of the Federal Rules of Evidence. Rule 609 (b) establishes a ten year limitation from conviction or release from resulting confinement upon the use of the conviction for impeachment purposes unless the probative value of the conviction *substantially outweighs* its prejudicial effect." (Citations omitted; emphasis added.) *State* v. *Sauris*, 227 Conn. 389, 409–10, 631 A.2d 238 (1993); see *State* v. *Dorans*, 261 Conn. 730, 755, 806 A.2d 1033 (2002) (same); *State* v. *Carter*, 228 Conn. 412, 431, 636 A.2d 821 (1994) (same). To the extent that this language suggests, as the trial court found when ruling on the plaintiffs' motion in limine and the plaintiffs now claim on appeal, that we have sanctioned or adopted the "substantially outweighs" test from rule 609 (b) of the Federal Rules of Evidence, it is expressly disavowed for the following reasons.

First, in *Nardini*, we stated that the federal standard "is not ours but may serve as a rough bench mark . . . ." *State* v. *Nardini*, supra, 187 Conn. 526. In so doing, however, we were referring solely to the ten year time limit set forth in rule 609 (b) of the Federal Rules of Evidence, and not to the standard upon which convictions beyond that ten year mark must be evaluated, namely, the "substantially outweighs" test. Put another way, we were signaling that, unless a conviction had some special significance to untruthfulness, the fact that it was more than ten years old would most likely preclude its admission under our *balancing test*. Indeed, a review of the analysis conducted in *Nardini* reveals that, even though the convictions were well beyond the "rough bench mark" of ten years; id.; we

did not apply the "substantially outweighs" test from rule 609 (b) to the defendant's claim. To the contrary, we concluded that it was not improper for the trial court to have admitted the evidence of the prior conviction for breaking and entering because "despite its antiquity . . . it could be said still to retain sufficient probative value for credibility *to outbalance* the rather minimal prejudice which arose from its admission . . . ." (Emphasis added.) Id., 529–30; see also *State* v. *Ciccio*, 77 Conn. App. 368, 388, 823 A.2d 1233 ("[w]hen [the rough ten year bench mark from *Nardini* is] considered with the other two factors of the test, we cannot say that the evidence of the defendant's 1986 conviction was more prejudicial than probative"), cert. denied, 265 Conn. 905, 831 A.2d 251 (2003).[17]

Second, in 1999, the judges of the Superior Court adopted the Connecticut Code of Evidence, which was intended to restate, in codified form, "Connecticut case law regarding rules of evidence as rules of court . . . ."

---

[17] Indeed, we note that since *Nardini* was decided, both this court and the Appellate Court continually have applied the three part balancing test, rather than the substantially outweighs standard, in determining whether prior convictions were too remote. See, e.g., *State* v. *Askew*, supra, 245 Conn. 364 (citing "substantially outweighs" standard, yet applying three part balancing test); *State* v. *Cooper*, 227 Conn. 417, 435–36, 630 A.2d 1043 (1993) (applying three part balancing test of *Nardini* to evidence of witness' 1964 prior conviction for breaking and entering with criminal intent); *State* v. *Ciccio*, supra, 77 Conn. App. 383 n.13, 386 (citing "substantially outweighs" standard in footnote, yet "consider[ing] the evidence and each of the factors set forth in § 6-7" of Connecticut Code of Evidence); *State* v. *Bailey*, 32 Conn. App. 773, 783–84, 631 A.2d 333 (1993) (applying three part balancing test; finding no abuse of discretion in admission of 1979 burglary conviction in 1992 trial for sexual assault); *State* v. *Irving*, 27 Conn. App. 279, 290, 606 A.2d 17 (applying three part balancing test; no abuse of discretion for trial court to admit evidence of defendant's 1978 robbery conviction), cert. denied, 222 Conn. 907, 608 A.2d 694 (1992); *State* v. *Kuritz*, 3 Conn. App. 459, 463, 489 A.2d 1053 (1985) (sixteen year old conviction for robbery admitted in case of risk of injury to child); but see *State* v. *Webb*, 37 Conn. App. 722, 732, 657 A.2d 711 (affirming trial court's decision to admit evidence of remote prior convictions under "substantially outweighs" standard), cert. denied, 234 Conn. 915, 660 A.2d 357 (1995).

Conn. Code Evid. § 1-2 (a). The drafters of our code of evidence appear to have incorporated our current reading of *Nardini* into § 6-7 of the Connecticut Code of Evidence, as the plain language of § 6-7 does not include the "substantially outweighs" language from rule 609 (b) of the Federal Rules of Evidence. To the contrary, § 6-7 merely identifies the remoteness of the convictions as one factor, of three, to be considered by the trial court under our balancing test. See also *State v. Nardini*, supra, 187 Conn. 526 ("we have indicated that remoteness in time, like relevance of the crime to veracity, is a factor to be weighed by the trial court in exercising its discretion"). Moreover, the commentary to § 6-7 of the Connecticut Code of Evidence states that this court has suggested a rough ten year time limit on prior convictions, and that crimes involving veracity may surmount that limit. At no point, however, does the commentary suggest that prior convictions more than ten years old, and involving veracity, are subject to the "substantially outweighs" standard of rule 609 of the Federal Rules of Evidence. In sum, the plain language of § 6-7 of the Connecticut Code of Evidence and its accompanying commentary, which was also officially adopted by the judges of the Superior Court, support a conclusion that such evidence is subject to the same three part balancing test as is evidence of all other convictions.[18]

---

[18] The Connecticut Code of Evidence is "a 'code' in the sense of a set of the general statements of rules embodied in the prior case law, without, however, being an attempt to restate every nuance, exception and different application of the rules of evidence expressed in that case law. That is why the Commentary accompanies each section, because that Commentary points to the general case law that the Code attempted to codify." D. Borden, "The New Code of Evidence: A (Very) Brief Introduction and Overview," 73 Conn. B.J. 210, 212 (1999). Furthermore, unlike in other situations, "in adopting the Code the Judges formally adopted the Commentary as well. . . . Thus, the Code must be read together with its Commentary in order for it to be fully and properly understood." Id., 213.

Third, there are significant differences between how prior convictions involving veracity are treated under our code of evidence and the Federal Rules of Evidence. For example, under the Federal Rules of Evidence, convictions under ten years old and involving crimes of "dishonestly or false statement" are admissible regardless of the type of punishment attached. Fed. Rule Evid. 609 (a). This approach is in direct contrast to our code of evidence, which limits impeachment to evidence of prior convictions involving crimes "punishable by imprisonment for more than one year." Conn. Code Evid. § 6-7 (a). Further, unlike all other convictions, the Federal Rules of Evidence do not subject evidence of convictions for crimes involving "dishonesty or false statement" to the general probative value versus prejudicial effect balancing test set forth in rule 403 of the Federal Rules of Evidence.[19] To the contrary, our code subjects evidence of convictions for *all* crimes, even those involving dishonesty or untruthfulness, to the balancing test set forth in § 6-7 of the Connecticut Code of Evidence. Lastly, under rule 609 (b) of the Federal Rules of Evidence, the burden is on the proponent of the evidence of prior convictions to demonstrate that the probative value substantially outweighs the prejudicial effect. *United States* v. *Weichert,* 783 F.2d 23, 26 n.3 (2d Cir. 1986). Under our code, however, the burden is on the party objecting to evidence of prior convictions to show the prejudice likely to arise from its admission. Conn. Code Evid. § 6-7, commentary; *State* v. *Harrell,* 199 Conn. 255, 262, 506 A.2d 1041 (1986). These general differences between the treatment of crimes involving dishonesty under the Federal Rules of Evidence and our code of evidence counsel strongly against our appli-

[19] Rule 403 of the Federal Rules of Evidence provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

cation of the "substantially outweighs" standard of rule 609 of the Federal Rules of Evidence to evidence of remote prior convictions offered under § 6-7 of the Connecticut Code of Evidence.

Lastly, we believe that application of the "substantially outweighs" standard to evidence offered under § 6-7 of the Connecticut Code of Evidence unnecessarily complicates the trial court's analysis. More specifically, under the three part balancing test, the trial court is already weighing (1) the potential for the evidence to cause prejudice, (2) its significance to indicate untruthfulness, and (3) its remoteness in time. Conn. Code Evid. § 6-7. To require the trial court to conduct a separate analysis of probative value versus prejudicial effect within the third prong would be merely to duplicate the first two factors of the balancing test.

Accordingly, we expressly disavow any language in prior case law suggesting that we have adopted the "substantially outweighs" test from rule 609 (b) of the Federal Rules of Evidence. In so doing, however, we reaffirm the central thrust of *Nardini,* namely, the fact that "the ten year benchmark . . . is not an absolute bar to the use of a conviction that is more than ten years old, but, rather, serves merely as a guide to assist the trial judge in evaluating the conviction's remoteness." *State* v. *Askew,* supra, 245 Conn. 364–65; see also *State* v. *Irving,* 27 Conn. App. 279, 290, 606 A.2d 17 ("[f]inally, [a] prior conviction which is more than ten years old may, under some circumstances, retain some probative value which is minimally sufficient to overcome any marginal prejudice, and may be admissible, therefore, without a wholly unreasonable exercise of a trial court's discretion" [internal quotation marks omitted]), cert. denied, 222 Conn. 907, 608 A.2d 694 (1992). Put another way, the fact that a prior conviction is more than ten years old should greatly increase the weight carried by the third prong in the balancing test set forth

in § 6-7 of the Connecticut Code of Evidence, unless that prior conviction relates to the witness' veracity.[20]

Turning to the present case, we are unpersuaded that the trial court abused its discretion in denying the plaintiffs' motion in limine concerning evidence of Felis' forty-one federal felony convictions in 1986, which included convictions for mail fraud, wire fraud, conspiracy and securities fraud in violation of Rule 10b-5 of the Securities and Exchange Commission. To begin with, evidence of Felis' prior criminal convictions has a high degree of "significance . . . in indicating untruthfulness . . . ." Conn. Code Evid. § 6-7 (a) (2). By taking the witness stand, Felis put his credibility into question, and evidence of his prior convictions had a high probative value on that credibility. Put another way, the nature of the crimes Felis was convicted of, fraud and conspiracy, certainly render them probative to the issue of his credibility and truthfulness. See *State* v. *Nardini*, supra, 187 Conn. 523 ("[s]trictly speaking, only a conviction for perjury or some kind of fraud bears directly upon untruthfulness"); see also *Gordon* v. *United States*, 383 F.2d 936, 940 (D.C. Cir. 1967), cert. denied, 390 U.S. 1029, 88 S. Ct. 1421, 20 L. Ed. 2d 287 (1968) (Judge Warren E. Burger declaring that "[i]n common human experience acts of deceit, fraud, cheating, or stealing, for example, are universally regarded as conduct which reflects adversely on a man's honesty and integrity"). Moreover, given the nature of the allegations in this case, the fact that Felis' version of what happened during the course of this dispute varied considerably from the testimony of the defendants and other wit-

---

[20] This approach mirrors the approach taken where the state is attempting to introduce evidence of prior convictions, for purposes of impeaching the defendant's credibility, which are closely related to the charged crime. *State* v. *Harrell*, supra, 199 Conn. 261 ("[w]e recognize that where the prior crime is quite similar to the offense being tried, a high degree of prejudice is created and a strong showing of probative value would be necessary to warrant admissibility" [internal quotation marks omitted]).

nesses further counsels against the exclusion of evidence of his prior convictions. See *State* v. *Askew*, supra, 245 Conn. 369 ("[w]hen a case [would be] narrowed to the [issue of] credibility of [witnesses] . . . there [is] greater, not less, compelling reason for exploring all avenues which would shed light on which of the . . . witnesses [is] to be believed" [internal quotation marks omitted]); see also *United States* v. *Spero*, 625 F.2d 779, 781 (8th Cir. 1980) ("in situations such as this, where the credibility of one witness must be weighed directly against that of another, the probative value of a prior conviction may well be enhanced, rather than diminished").

Although the probative value of evidence of his prior convictions is certainly *damaging* to Felis' credibility, that does not necessarily impart an undue degree of *prejudicial* effect as well. Conn. Code Evid. § 6-7 (a) (1). The third party complaint did not accuse Felis of any crime or action similar in nature to those underlying his prior convictions, and, therefore, this was not a situation in which there was a danger that the jury would believe that "if he did it before he probably did so this time." (Internal quotation marks omitted.) *State* v. *Carter*, 189 Conn. 611, 644, 458 A.2d 369 (1993). His prior convictions also did not involve "infamous" crimes, from which the jury may be inclined to punish Felis based on their view of him as a human being, without regard to his actual conduct in the present dispute. See *State* v. *Nardini*, supra, 187 Conn. 529 ("murder [and] some other violent offense[s] are . . . of such a serious or degrading nature that [a] jury might [be] influenced by the knowledge that the defendant had committed them many years before").

Lastly, Felis' confinement ended thirteen years prior to trial,[21] which is not significantly beyond our rough

[21] Although not challenged on appeal, we note that the trial court properly stated that the measuring point for a remoteness determination under § 6-7 of the Connecticut Code of Evidence is the date of conviction or the date

bench mark of ten years. Conn. Code Evid. § 6-7 (a) (3). Given the relationship of those prior convictions to Felis' veracity, we are not persuaded that their admission, limited to the sole purpose of impeaching his credibility as a witness, presents a situation where an "abuse of discretion is manifest or an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Rivera*, supra, 221 Conn. 73; see *United States* v. *Payton*, 159 F.3d 49, 56–57 (2d Cir. 1998) (no abuse of trial court's discretion to admit evidence of witness' thirteen year old convictions for making intentional false statement under oath to public official and for third degree larceny).

## IV

The plaintiffs next claim that, even if the evidence of Felis' prior convictions properly was admitted, the trial court improperly denied their request for a mistrial when the defendants' use of that evidence exceeded the limited scope for which it was admitted. The defendants contend that their inadvertent use of the evidence did not warrant a mistrial. Again, we agree with the defendants.

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . .

of release from resulting confinement, whichever is later. *State* v. *Carter*, supra, 228 Conn. 431; see *State* v. *Dorans*, supra, 261 Conn. 754 n.27.

The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 75–76, 826 A.2d 1126 (2003).

As noted in part III of this opinion, when denying the plaintiffs' motion in limine, the trial court stressed that the use of the convictions for any purpose other than to impeach Felis' credibility "would be to invite a mistrial motion and a mistrial ruling" by the court.[22] Despite the court's ruling, Felis took the stand during the plaintiffs' case-in-chief and testified about his prior criminal convictions.

During the defendants' case-in-chief, testimony was elicited from Aghamohammadi that touched upon Felis' prior criminal convictions. More specifically, following questions concerning Felis' departure from Label Systems in order to pursue a career in the financial industry, the following colloquy occurred between Aghamohammadi and his attorney:

"[Defendants' Counsel]: And when did Mr. Felis return to Label Systems?

"[The Witness]: He used to come on and off, and I think—I'm not exactly sure, but a year later he came back as a full time.

"[Defendants' Counsel]: And during that time he was gone or only coming infrequently, did you still have contact with him on a regular basis?

"[The Witness]: Yes, he used to come down and talk to me, that what he was doing, and, you know, in the

---

[22] See footnote 15 of this opinion.

beginning he was tell[ing] me, you know, how much money he was making in New York, *and at the time when he had a trouble, he used to tell me that he has to go for a weekend.*

"[Plaintiffs' Counsel]: Objection, Your Honor.

"The Court: Sustained." (Emphasis added.)

Immediately after sustaining the objection, the court excused the jury so that the trial judge could make an important personal phone call. While the jury was absent from the courtroom, the plaintiffs moved for a mistrial based upon Aghamohammadi's testimony that "[Felis] has to go for a weekend." This motion was denied by an oral ruling of the trial court.

The plaintiffs claim that this was improper because Aghamohammadi's testimony "elevated [Felis' convictions] to something that was not esoteric but something for which Felis served time . . . [and to] the extent that incarceration was attached to this crime it made Felis a bad person who would be capable of all of the things he was accused of, including initiating a lawsuit for an improper purpose and without probable cause . . . ." Our review of the record persuades us, however, that the trial court did not abuse its discretion by determining that Aghamohammadi's brief and obscure reference to Felis' prior convictions was not such an occurrence upon which the plaintiffs "cannot have a fair trial . . . and the whole proceedings are vitiated." (Internal quotation marks omitted.) *State* v. *Higgins,* supra, 265 Conn. 75.

Aghamohammadi's statement that "[Felis] has to go for a weekend" did not reveal necessarily to the jury the fact that Felis had received a prison sentence after his conviction, and that he was serving his six month sentence on the weekends in New York. Even though Aghamohammadi was referring to the time when

"[Felis] had a trouble," we are unpersuaded that any reasonable juror would infer that activities conducted on "a weekend" would involve incarceration. To the contrary, we believe most jurors would assume that if an individual was incarcerated for a criminal conviction, it would be for an extended and *continuous* period of time, and not for weekend stays. The fact that Aghamohammadi did not use a term such as incarceration, jail or prison in conjunction with "go for a weekend" only serves to enhance the tenuous nature of the plaintiffs' claim. Moreover, Felis had testified prior to Aghamohammadi, and during his direct examination he voluntarily revealed to the jury information relating to his convictions, including the date of conviction, the number of counts, the allegations made, and the fact that a $25,000 fine was paid. Further, on redirect examination, the following colloquy occurred between Felis and his attorney:

"[Plaintiffs' Counsel]: What was that [$25,000] check for?

"[The Witness]: This is for the fine that I received for my conviction.

"[Plaintiffs' Counsel]: And was that the only punishment that you received, sir?

"[The Witness]: No."

This testimony from Felis was just as likely, if not more likely, to place the notion that Felis was incarcerated for his crimes into the minds of the jurors as was Aghamohammadi's brief and obscure statement that "he has to go for a weekend."[23] Accordingly, we conclude that the trial court did not abuse its discretion

---

[23] The plaintiffs also claim that, given the fact that this trial was relatively objection free, the mere fact that they had to object to Aghamohammadi's answer served to strengthen the prejudicial effect of the statement. We reject this claim summarily.

by finding that Aghamohammadi's testimony did not warrant a mistrial.

V

After the jury returned its verdict, the plaintiffs filed a motion for remittitur, claiming that the damages awarded to the defendants on their vexatious litigation claims were not supported by the evidence, were excessive, and, therefore, they should be remitted in toto. The defendants filed an objection to the motion, and, after hearing oral argument from the parties, the trial court issued a memorandum of decision denying the motion. The plaintiffs now renew these claims on appeal, and contend that the trial court improperly denied their motion for remittitur because: (1) there was insufficient evidence of a causal connection between their appeal of the awards of unemployment benefits and the injuries allegedly suffered by the defendants; and (2) the damages awarded to the defendants were excessive. We disagree.

"In considering a motion to set aside the verdict, the court must determine whether the evidence, viewed in the light most favorable to the prevailing party, reasonably supports the jury's verdict. . . . The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be indulged in favor of its correctness." (Citation omitted.) *Mather* v. *Griffin Hospital*, 207 Conn. 125, 139, 540 A.2d 666 (1988). A conclusion that the jury exercised merely poor judgment is an insufficient basis for ordering a remittitur. *Wochek* v. *Foley*, 193 Conn. 582, 587, 477 A.2d 1015 (1984). "The concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony, is a powerful argument for sustaining the action of the trial court." *Chanosky* v. *City Building Supply Co.*, 152 Conn. 642, 643, 211 A.2d 141 (1965). "It is the function of this court to determine whether

the trial court abused its discretion in denying [a defendant's] motion to set aside the verdict." (Internal quotation marks omitted.) *Ham* v. *Greene*, 248 Conn. 508, 536, 729 A.2d 740, cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999).

## A

Turning first to the expansive causation claim set forth by the plaintiffs, we interpret the primary thrust of that claim to be that "[a]lthough [the trial court] correctly set forth the legal standard regarding proximate cause [the court] did not correctly apply the substantial factor test to the evidence."[24] We disagree.

"[P]roximate cause [is] defined as an actual cause that is a substantial factor in the resulting harm . . . ." (Internal quotation marks omitted.) *Doe* v. *Manheimer*, 212 Conn. 748, 757, 563 A.2d 699 (1989), overruled in part on other grounds, *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 608, 662 A.2d 753 (1995). The "test" for proximate cause is whether the defendant's conduct was a " 'substantial factor' " in producing the plaintiff's injury. Id., 758. This substantial factor test reflects the inquiry fundamental to all proximate cause questions, namely, "whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence." (Internal quotation marks omitted.) Id. "The question of proximate causation generally belongs to the trier of fact because causation is essentially a factual issue. . . . It becomes

[24] In their main brief, the plaintiffs extensively cited to the doctrine of superceding cause in support of their claim that the defendants had failed to establish a proper causal connection between the appeal of the unemployment benefit awards and the alleged injuries. As the plaintiffs subsequently noted in their reply brief, however, this court abandoned the doctrine of superceding cause prior to the submission of their main brief, and, therefore, this line of argument is unpersuasive. See *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 433, 820 A.2d 258 (2003) (abandoning doctrine of superseding cause).

a conclusion of law only when the mind of a fair and reasonable [person] could reach only one conclusion; if there is room for a reasonable disagreement the question is one to be determined by the trier as a matter of fact." (Citations omitted; internal quotation marks omitted.) *Stewart* v. *Federated Dept. Stores, Inc.*, supra, 611.

Giving every reasonable presumption in favor of its correctness, we conclude that the trial court did not abuse its discretion when denying the plaintiffs' motion for remittitur. See *Mather* v. *Griffin Hospital*, supra, 207 Conn. 139. As previously noted in this opinion, Felis appealed from the awards of unemployment benefits in April, 1993. Over the next four months, three separate hearings were held prior to the appeals being withdrawn summarily. During the time that the appeals were pending, the defendants were faced with trying to defend against serious charges of wilful and felonious misconduct, the possible loss of their only source of income, namely, the unemployment benefits, and the possibility that they would have to return any benefits that they already had received. While the plaintiffs are correct in noting that other factors, including the defendants' actual termination, the birth of their child, and the present civil action, also may have contributed to the defendants' emotional harm, this did not preclude the jury from reasonably concluding, on the basis of the evidence presented at trial, that the initiation and pursuit of the appeals of the awards of unemployment benefit, without probable cause, were a substantial and concurrent cause[25] of the defendants' injuries, and thus that the defendants had established proximate causation. Accordingly, we reject the plaintiffs' claim.

---

[25] "A concurrent cause is contemporaneous and coexistent with the defendant's wrongful conduct and actively cooperates with the defendant's conduct to bring about the injury. . . . A concurrent cause does not relieve the defendant of liability." (Citations omitted.) *Wagner* v. *Clark Equipment Co.*, 243 Conn. 168, 183, 700 A.2d 38 (1997).

B

The plaintiffs further claim that the trial court improperly denied their motion for remittitur because the damages awarded to the defendants were excessive and offend the sense of justice. Again, we disagree.

The law concerning excessive verdicts is well settled. "The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption. . . . The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be indulged in favor of its correctness. . . . This is so because [f]rom the vantage point of the trial bench, a presiding judge can sense the atmosphere of a trial and can apprehend far better than we can, on the printed record, what factors, if any, could have improperly influenced the jury." (Internal quotation marks omitted.) *Ham* v. *Greene*, supra, 248 Conn. 536; *Mather* v. *Griffin Hospital*, supra, 207 Conn. 138–39.

As an initial matter, we must first establish the contours of the awards that are subject to our appellate review. The jury awarded Aghamohammadi $60,000 and Markham $120,000 in compensatory damages for vexatious litigation. These amounts were automatically doubled pursuant to the terms of § 52-568 (1). See footnote 6 of this opinion. Therefore, when evaluating whether the damages awarded to the defendants were excessive, the trial court properly focused on the amounts actually awarded, and not on the amount resulting from the

application of the statutory damages. See *Goral* v. *Kenney*, 26 Conn. App. 231, 239, 600 A.2d 1031 (1991) (excluding from determination of excessiveness statutory damages awarded for defendant's rejection of plaintiff's offer of judgment). Further, we will review, as did the trial court, the awards made to the defendants separately, as they constitute two distinct awards. The trial court determined that the individual awards, "though ample," were certainly " 'within the necessarily uncertain limits of just damages,' " and, therefore, declined to remit any portion of the awards.

Giving every reasonable presumption in favor of its correctness, we conclude that the trial court did not abuse its discretion when denying the plaintiffs' motion for remittitur. See *Mather* v. *Griffin Hospital*, supra, 207 Conn. 139. In regard to Aghamohammadi, the jury reasonably could have credited his testimony that the initiation of the appeal, the accusation of wilful and felonious misconduct, and the concomitant threatened loss of benefits, caused him such emotional harm as to give up all hope of being successful in the United States, and to plead with his wife to move back to his native country of Iran.[26] Thus, we agree with the trial court that Aghamohammadi's feelings, "as he expressed and visibly displayed them to the jury," reasonably supported the jury's award of $60,000 and that the jury's award "reflects a thoughtful exercise of judgment and discretion."

The award of $120,000 to Markham, while certainly more substantial than the award to Aghamohammadi, also is reasonably supported by the evidence presented at trial. Specifically, viewed in the light most favorable to Markham, the jury reasonably could have found that she had endured mental and emotional suffering due

---

[26] While Aghamohammadi was a native of Iran, Markham was a United States citizen.

to the vexatious appeal of the unemployment awards for the same reasons as we discussed with regard to Aghamohammadi. In addition, the jury could have found that the emotional damage to Markham was exacerbated, in comparison to Aghamohammadi, by virtue of the fact that she recently had given birth and had a prior history of depression. Indeed, Markham's testimony provided reasonable support for the jury's conclusion that the appeal deeply distressed her, both while the appeal was pending and for a long period after it was withdrawn summarily.[27] If the jury thought Markham was embellishing her testimony, or exaggerating the impact the appeal had on her well-being, it could have rejected her claim or awarded her a smaller amount in damages. In its memorandum of decision, however, the trial court noted that when "the [c]ourt saw her give that testimony, it knew at once that the jury would be moved by it." See *Chanosky* v. *City Building Supply Co.*, supra, 152 Conn. 643 ("[t]he concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony, is a powerful argument for sustaining the action of the trial court"). Accordingly, while we agree that the damages awarded to Markham were "ample," we nevertheless are unable to conclude that the trial court abused its discretion by denying the plaintiffs' motion for remittitur.

The plaintiffs contend, however, that our resolution of this claim should be controlled by *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 530 A.2d 596 (1987). We disagree. In *Buckman*, after the plaintiff was terminated

---

[27] During the direct examination of Markham, the following colloquy occurred with her attorney concerning the unemployment benefits awarded to her:

"[Defendants' Counsel]: When you discovered that Label Systems was contesting [your] right to collect unemployment compensation benefits, how did you feel?

"[The Witness]: I felt like my throat had been ripped out. It was like they were assaulting me all over again."

from his employment with the defendant, the plaintiff attempted to notify the defendant, by mail and orally, that he wished to continue his health insurance and that he needed a conversion form. Id., 167. The defendant was aware that the plaintiff was suffering from an ulcer and from dental problems, and that his wife was enduring a difficult pregnancy, yet the defendant never replied to the plaintiff's request. Id. Although the plaintiff never actually had his insurance coverage suspended, he eventually brought an action against the defendant to recover damages for the emotional distress he had suffered as a result of the defendant's inaction, and his resulting belief that he lacked health insurance. Id., 167–69. The jury found in favor of the plaintiff, and awarded him $51,595.94 in damages. Id., 169. The trial court subsequently denied the defendant's motion to set aside the verdict and for remittitur. Id. On appeal to this court, the defendant claimed that the $50,000[28] awarded to the plaintiff in compensatory damages so shocked one's sense of justice that the trial court erred in denying its motion for remittitur. Id., 174. We agreed, and ordered a new trial unless the plaintiff filed a remittitur of $35,000 within three weeks time. Id., 177. In so ordering, we noted that there was "no claim and no proof . . . of a permanent injury in this case." Id., 176. Furthermore, we noted that while we did "feel that the award was excessive, the excessiveness appears attributable to [jury] outrage over the total lack of regard for the rights of the plaintiff which the defendant exhibited in this matter." Id., 176 n.10.

*Buckman* is distinguishable from the present case for several reasons. To begin with, in *Buckman*, the defendant merely failed to act, while in the present case,

---

[28] The parties agreed that $1595.94 of the amount awarded to the plaintiff was for special damages, which covered the plaintiff's out-of-pocket expenses. *Buckman v. People Express, Inc.*, supra, 205 Conn. 169 n.4. Those damages were not included in the defendant's motion for remittitur.

the plaintiffs made affirmative charges of felonious and wilful misconduct against the defendants, appealed the unemployment benefits awarded to both defendants, and forced the defendants to attend three separate hearings over the course of four months before the appeals were abandoned summarily. Second, in the present case, the defendants have claimed lasting emotional distress, extending well beyond the withdrawal of the appeals, whereas in *Buckman* we noted that there was "no claim and no proof . . . of a permanent injury . . . ." Id., 176. Third, in *Buckman* we concluded that the jury likely awarded damages based on its outrage over the defendant's overall conduct. Id., 176 n.10. The jury in the present case, however, rejected several of the claims made by the defendants in their counterclaim and third party complaint. If the jury were acting with the same outrage over the plaintiffs' conduct as the jury in *Buckman*, it would be reasonable to expect the jury to have found for the defendants on at least some of their remaining claims. By rejecting certain claims, and awarding differing amounts to the defendants, however, the jury demonstrated that it reached its verdict by carefully considering all of the evidence, and not through prejudice, mistake or corruption. In sum, the plaintiffs have "provided us with no persuasive reason to disturb the work of either the jury or the trial court with respect to noneconomic damages, and our independent review of the record has not disclosed any." *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 553, 733 A.2d 197 (1999).

## VI

The plaintiffs' remaining claim on appeal, and all of the defendants' claims on cross appeal, relate to the jury's finding that the defendants were liable for converting the proceeds of the insurance check resulting from their car accident, and the trial court's subsequent award of $19,303.13 in punitive damages to Label Sys-

tems. In their cross appeal, the defendants first claim that the trial court improperly denied their motion for a directed verdict and judgment notwithstanding the verdict on the conversion claim because: (1) Label Systems lacked standing to bring a conversion claim on the insurance proceeds; and (2) Label Systems did not establish a prima facie case of conversion. We reject both of these claims.

It is well established that "[o]ur review of a trial court's refusal to direct a verdict or to render judgment notwithstanding the verdict takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Citation omitted; internal quotation marks omitted.) *Cohen* v. *Yale-New Haven Hospital*, supra, 260 Conn. 761.

## A

Because standing implicates the subject matter jurisdiction of a court, we must first address the defendants' claim that the trial court improperly determined that Label Systems had standing to bring a conversion claim as to proceeds of the insurance check resulting from the defendants' accident in the company car.

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . Standing is not a technical rule intended to keep aggrieved parties

out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Citations omitted; internal quotation marks omitted.) *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 693, 600 A.2d 1019 (1991).

Conversion is "some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm." (Internal quotation marks omitted.) *Aetna Life & Casualty Co.* v. *Union Trust Co.*, 230 Conn. 779, 790–91, 646 A.2d 799 (1994). "The term 'owner' is one of general application and includes one having an interest other than the full legal and beneficial title. . . . The word owner is one of flexible meaning, and it varies from an absolute proprietary interest to a mere possessory right. . . . It is not a technical term and, thus, is not confined to a person who has the absolute right in a chattel, but also applies to a person who has possession and control thereof." (Citations omitted.) *Hope* v. *Cavallo*, 163 Conn. 576, 580–81, 316 A.2d 407 (1972); id., 583–84 (although not title holder, state was owner of truck and subject to suit under General Statutes § 52-556, because state had exclusive possession and control over truck, and insured it).

The trial court, taking the evidence in a light most favorable to the prevailing party, reasonably could have concluded that Label Systems had standing to bring a conversion claim on the insurance proceeds. Both Felis and the defendants testified that Felis had arranged for

the defendants to obtain and use a company car, and the defendants eventually surrendered the car to Felis on the morning of their termination. Indeed, the primary purpose for which the defendants used the car was to commute between their residence in Waterbury and the Label Systems' office in Bridgeport. While there was testimony that Label Systems did not hold title to the car, and that the financing of the car was arranged through RPM,[29] the parent company for Label Systems, the primary benefit derived from the defendants' use of the car, and any detriments that would have arisen from their inability to use the car, flowed to Label Systems. Further, upon demand for the proceeds, the defendants tendered a check to Felis, and not to RPM or any other entity. Accordingly, we conclude that the trial court properly found that Label Systems' possession and control of car gave them standing to bring a conversion claim as to the insurance proceeds related to an accident involving the company car. See, e.g., *Gill* v. *Petrazzuoli Bros., Inc.*, 10 Conn. App. 22, 27, 521 A.2d 212 (1987) (although not title holder, plaintiff had requisite standing as owner to bring action for loss of car).

B

The defendants' next claim is that the trial court improperly determined that Label Systems had established a prima facie case of conversion. To establish a prima facie case of conversion, Label Systems had to establish that: (1) the insurance proceeds given to the defendants belonged to Label Systems; (2) the defendants deprived Label Systems of the funds for an indefinite period of time; (3) the defendants' conduct was unauthorized; and (4) the defendants' conduct harmed Label Systems. See *Devitt* v. *Manulik*, 176 Conn. 657,

---

[29] In 1989, Felis sold Label Systems to RPM, a specialty chemical conglomerate that owned twenty-six other different companies at that time.

660, 410 A.2d 465 (1979); *Durso* v. *Vessichio*, 79 Conn. App. 112, 125, 828 A.2d 1280 (2003); *Aubin* v. *Miller*, 64 Conn. App. 781, 796, 781 A.2d 396 (2001).

Viewing the evidence in the light most favorable to the prevailing party, the trial court reasonably could have found that Label Systems established each of these elements. As discussed in part VI A of this opinion, Label Systems established that it had a right to the insurance proceeds, as Felis had provided the car to the defendants, and the defendants ultimately returned possession to him upon their termination. Accordingly, if Label Systems had a right to possess the car, it also had a right to possess the insurance proceeds desig- nated for the repair of the car. Second, the defendants conceded that they had received the insurance check in December, 1992, and had deposited the check in their personal checking account, where it remained until they tendered a check for the same amount to Felis in March, 1993. Therefore, the defendants deprived Label Systems of the proceeds for several months. Third, there is no evidence in the record that suggests that Label Systems ever authorized the defendants to place the proceeds into their personal checking account prior to their ter- mination, or to keep the proceeds there after their termi- nation.[30] Finally, the defendants' retention of the

---

[30] Further, we reject the defendants' claim that Label Systems' failure to make a formal demand for the insurance money during that four month period precludes a conversion claim or somehow made the defendants' possession authorized. While it was evident that the defendants' possession and use of *the company car* was authorized, the jury reasonably could have found that their possession of the proceeds from the insurance check, in their own personal checking account, was not rightful or authorized. Conversions may be grouped into two general classes: (1) those where the possession is originally wrongful; and (2) those where it is rightful and subsequently becomes wrongful. Under the first class, wrongful use and the unauthorized dominion constitute the conversion; therefore no demand for the return of the personal property is required. Under the second class, since the possession is rightful and there is no act of conversion, there can be no conversion until the possessor refuses to deliver up the property upon demand. See *Moore* v. *Waterbury Tool Co.*, 124 Conn. 201, 211, 199 A. 97 (1938); see also 18 Am. Jur. 2d, Conversion § 84 (1985) ("no demand is

insurance proceeds harmed Label Systems, as it denied the company the ability to use those proceeds to repair the car. Accordingly, we conclude that the trial court did not abuse its discretion in concluding that Label Systems established a prima facie case of conversion.

## VII

Label Systems' remaining claim on appeal, and the defendants' remaining claims on cross appeal, all address the specific amount awarded by the trial court as punitive damages. Specifically, Label Systems claims that the trial court abused its discretion by improperly limiting the amount of attorney's fees awarded as punitive damages to $19,303.13, as that amount was significantly lower than the actual attorney's fees that it had incurred. To the contrary, the defendants claim that: (1) the award exceeds the constitutional limits on punitive damage awards, as set forth in *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 419–28, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003); and (2) the trial court abused its discretion by awarding damages that exceeded Label Systems' reasonable litigation expenses. We reject the claims of both parties, and, accordingly, we affirm the judgment of the trial court.

## A

We turn first to the defendants' claim that under the principles set forth in *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 419–28, the punitive damage award of $19,303.13 in attorney's fees violated the due process clause of the fourteenth amendment of the United States constitution. Label Systems contends

necessary where the conversion results from the defendant's securing possession of the property illegally or tortuously, by fraud or other wrongful conduct"). Consequently, the jury reasonably could have found that the defendants' act of cashing the insurance check and depositing the proceeds into their personal checking account was wrongful, and thus no demand was necessary.

that this claim was not properly presented to the trial court, and, therefore, that we should not address it in this appeal. We agree with Label Systems.

Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." See also *Rivera* v. *Double A Transportation, Inc.*, 248 Conn. 21, 33, 727 A.2d 204 (1999) (claims not addressed nor decided by trial court are not properly before appellate court). In the present case, Label Systems filed a motion requesting that the trial court award approximately $252,481.25 in attorney's fees as punitive damages. The defendants were able to express their strenuous objection to this motion via a memorandum in opposition, a supplemental memorandum and oral argument before the trial court. All of this argument concerning punitive damages was conducted *after* the jury had awarded Label Systems $50 in compensatory damages. In their memorandum in opposition, the defendants claimed that, given the small amount of compensatory damages awarded by the jury, "the amount of attorney's [fees Label Systems] seeks to recover is grossly excessive, and if any attorney's fees are awarded as punitive damages, they should be appropriately limited in relation to the claim [Label Systems] prevailed on and the jury's compensatory award and would be nominal." Despite pursuing this line of argument, the defendants never once raised a claim regarding the constitutionality of punitive damage awards, or

alerted the trial court to the three guideposts[31] govern-
ing such claims, as enunciated in *BMW of North
America, Inc.* v. *Gore*, 517 U.S. 559, 574–75, 116 S. Ct.
1589, 134 L. Ed. 2d 809 (1996).[32] The defendants also
failed to raise their constitutional argument in any
appropriate postjudgment motion, and now raise it for
the first time in their brief to this court. Accordingly, we
conclude that the defendants failed to properly preserve
their claim at trial, and we decline to address it in this
appeal. See *Local Union No. 38* v. *Pelella*, 350 F.3d 73, 89
(2d Cir. 2003) (Court declined to address constitutional
challenge to punitive damage award stating: "Where a
party contends that a punitive damages award is exces-
sive, that issue is ripe for legal challenge after a verdict
is entered. . . . For that reason, excessive punitive

---

[31] The United States Supreme Court instructed courts reviewing punitive
damages to consider three guideposts: (1) the degree of reprehensibility of
the defendant's misconduct; (2) the disparity between the actual or potential
harm suffered by the plaintiff and the punitive damages award; and (3) the
difference between the punitive damages awarded by the jury and the civil
penalties authorized or imposed in comparable cases. *BMW of North
America, Inc.* v. *Gore*, 517 U.S. 559, 574–75, 116 S. Ct. 1589, 134 L. Ed. 2d
809 (1996).

[32] The defendants correctly note that *State Farm Mutual Automobile Ins.
Co.* v. *Campbell*, supra, 538 U.S. 408, was decided after the trial court
rendered its decision on Label Systems' motion for punitive damages.
Accordingly, they argue that the opinion's cautionary language concerning
single digit multipliers; id., 425; arose subsequent to trial, and, therefore,
they could not have raised it at trial. This claim is without merit. *State Farm
Mutual Automobile Ins. Co.* v. *Campbell*, supra, 419–28, merely reaffirmed
the principles originally set forth in *BMW of North America, Inc.* v. *Gore*,
supra, 517 U.S. 574–75, including the three guideposts used for reviewing
punitive damage awards under the fourteenth amendment of the United
States constitution. Further, the cautionary language in *Campbell* concerning
single digit multipliers was not a dramatic or novel extension of the court's
prior case law. See *BMW of North America, Inc.* v. *Gore*, supra, 581 (noting
that precedent "suggested that the relevant ratio [between compensatory
and punitive damages] was not more than 10 to 1"); *Local Union No. 38* v.
*Pelella*, 350 F.3d 73, 90 (2d Cir. 2003) ("[T]he [c]ourt's *Campbell* decision
buttressed the ratios discussed in *Gore* but was not a necessary predicate
for a due process challenge. Local 38 failed to raise such a challenge with
the court below and the argument is therefore deemed waived.").

damages that violate the [d]ue [p]rocess [c]lause can be challenged through post-trial motions.").[33]

B

Turning to the remaining two claims, we note that, although from opposite perspectives, both Label Systems and the defendants claim that the trial court abused its discretion in awarding $19,303.13 in attorney's fees as punitive damages. We disagree, and affirm the judgment of the trial court.

To furnish a basis for recovery of punitive damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought. *Markey* v. *Santangelo*, 195 Conn. 76, 77–78, 485 A.2d 1305 (1985); *Manning* v. *Michael*, 188 Conn. 607, 619, 452 A.2d 1157 (1982). If awarded, punitive damages are limited to the costs of litigation less taxable costs, but, within that limitation, the extent to which they are awarded is in the sole discretion of the trier. *Chykirda* v. *Yanush*, 131 Conn. 565, 568, 41 A.2d 449 (1945); *Hanna* v. *Sweeney*, 78 Conn. 492, 494, 62 A. 785 (1906); *Bennett* v. *Gibbons*, 55 Conn. 450, 452, 12 A. 99 (1887). Limiting punitive damages to litigation expenses, including attorney's fees, " 'fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury.' *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 238, 477 A.2d 988 (1984)]." *Berry* v. *Loiseau*, 223 Conn. 786, 827, 614 A.2d 414 (1992). "We have long held that in a claim for damages proof of the

---

[33] The defendants also have failed to request review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine, and we decline to initiate such review on our own accord.

expenses paid or incurred affords some evidence of the value of the services, and if unreasonableness in amount does not appear from other evidence or through application of the trier's general knowledge of the subject-matter, its reasonableness will be presumed." (Internal quotation marks omitted.) *Markey* v. *Santangelo*, supra, 80.

After reviewing the evidence in the record concerning the attorney's fees incurred by Label Systems, and the trial court's extensive memorandum of decision, we are unable to conclude that an award of $19,303.13 in punitive damages constituted an abuse of discretion. Label Systems incurred more than $250,000 in attorney's fees throughout the course of this dispute, and requested a comparative amount in its original motion for punitive damages. In response to the trial court's request to isolate those fees incurred in relation to the claim of conversion of the insurance proceeds, Label Systems reduced its request by $44,934.66. Undertaking its own review of Label Systems' fees, and drawing upon its observations during the course of the trial, the trial court estimated that the conversion claim constituted 5 percent of Label Systems' attorney's fees prior to trial, 10 percent during trial, and 100 percent of the fees incurred in defending the favorable jury verdict on the conversion claim from the defendants' posttrial motions and attack. Although Label Systems only recovered $50 in interest, this does not necessarily make the pursuit of that claim, and the concomitant fees it incurred, de minimis, and, therefore, unable to support an award of punitive damages almost 400 times greater. To the contrary, although the conversion claim was a small part of the overall claims presented at trial, the importance of that claim was, as the trial court noted, twofold. First, it buttressed the other claims asserted by Label Systems, including breach of duty of loyalty and conversion of company goods, by demonstrating

the defendants' dishonesty and willingness to line their own pockets with their employer's money. Second, it provided Label Systems with a defense to the defendants' wrongful termination counterclaim, and it alleged that the conversion constituted evidence of wilful and felonious misconduct.

On the other hand, this claim was not so tightly interwoven with the other claims asserted by Label Systems, and with the concomitant fees incurred pursuing them, that the trial court would have been warranted in awarding Label Systems the full amount of fees requested. The trial judge who awarded punitive damages is the same judge who presided over the entire trial and post-trial proceedings, and, therefore, he had a firm knowledge from which to make a reasonable determination as to the time and resources necessary for Label Systems to pursue this claim. Accordingly, we are unwilling to conclude that the trial court abused its discretion by determining that reasonable attorney's fees for this claim constituted 5 percent of the fees incurred prior to trial, 10 percent during trial, and 100 percent posttrial.

The judgment is affirmed.

In this opinion the other justices concurred.